**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN CAMPBELL and LIZA ZAMD,<br><br>Plaintiffs,<br><br>v.<br><br>LAMBRIGHT PEST CONTROL SERVICES, INC. and TYRONE LAMBRIGHT, SR.<br><br>Defendants. | CASE NO. 1:23-cv-1132 (TJK)<br>JURY DEMANDED<br><br>Plaintiffs' Motion in Limine to Exclude Testimony and Disqualify Martin Upchurch<br><br>**HEARING REQUESTED** |

**Table of Contents**

I. Introduction .......... 1

II. Factual Background .......... 1

A. Contamination of Plaintiffs' Home Began Immediately After Defendants Removed Unbagged Fiberglass-Insulation .......... 1

B. Lack of Qualifications of Defendants' Purported Expert, Martin Upchurch .......... 3

III. Argument .......... 5

A. Mr. Upchurch's First Conclusion Fails All Four Elements of Rule 702 Because He Ignored Contrary Evidence and Provides No Scientific Basis for It .......... 6

B. Mr. Upchurch's Second Conclusion Fails All Four Elements of Rule 702 Because He Ignored Contrary Evidence to Arrive at His Conclusion .......... 9

C. Mr. Upchurch's Third Conclusion Fails All Four Elements of Rule 702 and Is Merely a Statement of an Irrelevant Fact .......... 13

D. Mr. Upchurch's Fourth Conclusion Fails All Four Elements of Rule 702 Because He Ignored Contrary Evidence and Fails to Support His Conclusion with Any Scientific Evidence .......... 14

E. Mr. Upchurch's Fifth Conclusion Fails All Four Elements of Rule 702 Because He Ignored Contrary Evidence, Failed to Support His Conclusion with Any Scientific Evidence, and Disqualified Himself as an Expert .......... 17

F. Mr. Upchurch's Does Not Have the Necessary Expertise in this Case, so this Court Should Exclude His Testimony in Its Entirety .......... 20

IV. Conclusion .......... 21

# Table of Authorities

## Cases


*Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433 (7th Cir. 2001) .......... 9
*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001) .......... 5, 13
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......... 5, 6, 8
*Equal Emp't Opportunity Comm'n v. Freeman*, 778 F.3d 463 (4th Cir. 2015) .......... 13
*Garcia v. GGI Glass Distribution Corp.*, No. CV 22–632 (TJK), 2024 WL 4253161 (D.D.C. Sept. 19, 2024) .......... 16, 18, 20
*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......... 16
*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) .......... 6
*In re Bextra Celebrex Mktg. Sales Practices*, 524 F. Supp. 2d 1166 (N.D. Cal. 2007) .......... 9, 21
*In re Lipitor (Atorvastatin Calcium)*, 185 F. Supp. 3d 761 (D.D.C. 2016) .......... 9
*In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016) .......... 21
*Meister v. Med. Eng'g Corp.*, 267 F.3d 1123 (D.C. Cir. 2001) .......... 16, 18, 21
*Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233 (D.D.C. 2018) .......... 6, 16, 19
*United States v. Day*, 524 F.3d 1361 (D.C. Cir. 2008) .......... 6
*Window Specialists, Inc. v. Forney Enterprises, Inc.*, 106 F. Supp. 3d 64 (D.D.C. 2015) .......... 9, 19

## I. Introduction

Plaintiffs respectfully move to exclude the opinion of Defendants' proposed expert, Martin Upchurch, and disqualify him in this case. Most glaringly, Mr. Upchurch has rendered conclusions based on unscientific and conflicting methodology, admitted that he lacks expertise in key areas, made unwarranted assumptions not disclosed in his report, and cherry-picked evidence to support his conclusion. Because Defendants cannot show Mr. Upchurch satisfies the four requirements under Rule 702, this Court should utilize its gate-keeping role to exclude Mr. Upchurch's report and preclude him from testifying should this case proceed to trial.

## II. Factual Background

### A. Contamination of Plaintiffs' Home Began Immediately After Defendants Removed Unbagged Fiberglass-Insulation

As explained in greater detail in Plaintiffs' accompanying Motion for Partial Summary Judgment, Plaintiffs contracted with Defendants to provide mouse-remediation services and to remove the moldy, dusty attic-insulation that was infested with mouse-excrement. Ex. 1, Parties' Contract for Services, LPC/01-0088. Defendants pledged that they would bag the insulation before removing it from Plaintiffs' attic — which is LPC's normal protocol — but admittedly did not do so. Ex. 2, T. Lambright Dep. 54:14–55:3. As a result, Defendants' actions resulted in copious amounts of contaminants being dumped in Plaintiffs' home, the contaminants made their way into Plaintiffs' heating, ventilation, and air-conditioning ("HVAC") system, and spread throughout Plaintiffs' house. Ex. 3, J. Campbell Dep. 57: 3-13; Ex. 4, L. Zamd Dep. 142:10-15.

Plaintiffs emailed Defendants hours after they left to complain about the widespread dust. Ms. Zamd's emails to Defendants explained that "there is a thin layer of dust almost everywhere on the top floor, including in my bathroom and part of my bedroom even though both doors were shut . . . . [T]he dust covered all the surfaces, not just the floor, and things like our toothbrushs

[sic] or wool coats can't be easily wiped down/washed/vacuumed." Ex. 5, Email Exchanges Between L. Zamd and T. Lambright (December 21, 2020), Campbell000010.

Facing worsening health-symptoms in the days after Defendants' work, Plaintiffs contracted with Columbia Restoration, an environmental remediation company. Ex. 6, Ltr. From T. Beckwith, Columbia Restoration, to L. Zamd (December 30, 2020), Campbell000011–12. Columbia Restoration cleaned every surface in Plaintiffs' home, including the walls and ceilings, and ran industrial HEPA air-filters on each floor of the home for over a week. Ex. 4, L. Zamd Dep. 131:3–14. In connection with the service, on December 30, 2020, Columbia Restoration's project manager sent Ms. Zamd a letter stating in part, that prior to cleaning the home, there was a "distinct 'gritty' layer of dust/particulates . . . far beyond what would be expected in a home that is cleaned at least once/month and did not appear to be just regular dust." Ex. 6, Ltr. From T. Beckwith, Columbia Restoration, to L. Zamd (December 30, 2020) Campbell000011. He also stated that that there was a "detectable odor throughout" the home and the air "felt heavy when inhaling." *Id.*

After more than a week of Columbia Restoration's cleaning, Plaintiffs still could not be in their bedroom, bathroom, or exercise-room on the third floor of their home, which was ground zero to where Defendants dropped the unbagged insulation. Plaintiffs hoped that they could remedy the issue themselves and kept the doors and windows open on the third floor almost every day, even in the winter, to air out the floor. Ex. 4, L. Zamd Dep. 21:5–15; Ex. 3, J. Campbell Dep. 25:6–15. Mr. Campbell also washed the hallway walls, and with some assistance from Ms. Zamd, applied Kilz primer on all the drywall in the bedroom. Ex. 3, J. Campbell Dep. 62:13–63:9; Ex. 4, L. Zamd Dep. 134:16–135:20. But nothing helped, and even as many months progressed, Plaintiffs still could not be on the third floor of their home. Ex. 3, J. Campbell Dep. 63:14–18; Ex. 4, L. Zamd Dep. 134:16–136:4.

More than a year after the disaster but still experiencing health-symptoms, Plaintiffs contracted to take their third floor walls down to the studs in the hopes that removing the drywall would stop Plaintiffs' symptoms. Ex. 4, L. Zamd Dep. 78:1-13 After the drywall was removed and until present, Plaintiffs have not had any problems being on the top floor of the home. Ex. 4, L. Zamd Dep. 81:16–82:7.

**B. Lack of Qualifications of Defendants' Purported Expert, Martin Upchurch**

Martin Upchurch works as an industrial hygienist, has a bachelor's degree in architectural engineering, and possess no advanced degrees. Ex. 7, M. Upchurch Dep. 11:13–14. He has been a certified industrial hygienist since 2004, Ex. 7, M. Upchurch Dep. 9:3–8, yet in his entire 20-year career, he has never testified for a plaintiff. Upchurch Dep. 23:12–15. He has not published papers in his field. Ex. 7, M. Upchurch Dep. 19:7–9. Apart from this matter, Mr. Upchurch has never worked on a case that involves both mold and fiberglass-insulation. Ex. 7, M. Upchurch Dep. 49:22–50:12. He admits he is not an expert on how mouse-allergens affect human-health. Ex. 7, M. Upchurch Dep. 102:16–104:17; 118:14–119:8; 120:4–8; 239:6–14.

Despite his lack of background on the key topics in this case — mold in fiberglass and mouse-allergens — he also chose not to become familiar with the relevant literature; to the contrary, in writing his report, he did not rely on any scientific articles, Ex. 8, Upchurch Report (reflecting there are no articles he relied upon), nor did he read any of the almost two dozen scientific articles Dr. Deborah Dickerson, Plaintiffs' expert, relied upon to make her conclusions. Ex. 7, M. Upchurch Dep. 211:22–212:14. The articles Dr. Dickerson cited include the replication-cycle of mold in drywall, a central issue to this matter. Despite choosing not to read the articles, Mr. Upchurch nevertheless acknowledged that they "could say something" with respect to the causal relationship between Plaintiffs' symptoms and the fiberglass-insulation removal. Ex. 7, M. Upchurch Dep. 211:22–212:14. Mr. Upchurch also admitted that, when drafting his report, he only

reviewed — but did not rely upon — three documents: the first was educational material about TAP insulation (which is not at issue in this matter) and the two others are scientific articles relating to (1) the pervasive harms of exposure to rodent-excrement, and (2) how mold grows on wallpaper, silicone gel, and agar. Ex. 8, Upchurch Report at 10. He made clear that even those three materials lacked any particle relevance to this case. Ex. 7, M. Upchurch Dep.108:3–9 ("I don't recall any reason that I would have pulled the [articles] other than they were referenced somewhere and I just wanted to get familiar with them.").

On this shaky foundation of no personal experience, without having read any of the research Dr. Dickerson cited, and not making an effort to research on his own, Mr. Upchurch made five conclusions in his report. As discussed below, the first two conclusions are (inaccurate) factual statements that any lay person or attorney can assert. These two conclusions make clear that Defendants cannot satisfy all the four necessary elements under Rule 702. The third conclusion is an unscientific factual statement and happens to be accurate, but it is of no consequence to the litigation, thus failing under Rule 702. The last two conclusions are so flawed that Defendants cannot satisfy the four necessary elements under Rule 702. Mr. Upchurch's conclusions are:

> 1. Although the plaintiffs claimed to have observed widespread, recurring contamination in the Residence after the Lambright insulation removal and replacement project had been completed, no documentation of such widespread, recurring contamination was found in the provided documents. Photographs taken on December 21 and 22, 2020 show light levels of dust on a toilet tank and bathtub (presumably in the same bathroom), and photographs taken on December 28, 2020 show a heavier level of dust on the top of the fire alarm below the attic access. None of the other approximately 250 photographs taken in the living spaces of the Residence by Ms. Zamd show visible dust or insulation debris.
>
> 2. Plaintiff Liza Zamd reported that she visited the upper levels of the Residence and took photographs of the attic space before the original fiberglass batt insulation was removed and immediately after it was removed, but did not report having any adverse health effects or observing any odors during those visits . . . . Lack of reported adverse health effects and/or odors during these visits contradicts that contamination from the removed insulation was the source of odors reported

> by the plaintiffs.
>
> 3. No evidence of contamination in the Residence due to activities performed by Lambright were observed by Arc or indicated to be present by the Arc sample results.
>
> 4. The "moderately elevated" level of mold reported by Arc was more likely than not due to mold growing on plants than building materials or claimed contamination from the attic-insulation removal.
>
> 5. Lacking such testing or analysis for insulation debris, MVOCs or murine antigens, and based upon the lack of odors being present in the attic area during Ms. Zamd's visits prior to new insulation being installed, there is no evidence that the insulation removal activities performed by Lambright were the cause of the odors or adverse health effects reported by the plaintiffs. In addition, no other potential source(s) of the odor or cause of any reported adverse health effects were identified by the plaintiffs or their expert.

Ex. 8, Upchurch Report, pp. 5–6. Mr. Upchurch's report is unsworn, but the Court need not look any further than his deposition testimony to understand why key matters in this case are beyond the scope of his expertise. Also, because Mr. Upchurch — by his own admissions — excluded consideration of probative evidence despite its relevance, Defendants cannot show that his opinions and conclusions satisfy the requirements under Rule 702. For these reasons, this Court should exclude Mr. Upchurch's report and disqualify him in this case.

## III. Argument

Not every person who wants to opine on a matter as an expert can do so. Instead, Rule 702 instructs that an expert must be qualified "by knowledge, skill, experience, training, or education," base testimony on "reliable principles and methods," "base[] testimony on sufficient facts or data," and offer "opinion reflect[ing] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "The proponent of the [expert] testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)). Defendants have not met this burden, nor can they.

While the party putting forth the expert must prove all elements under Rule 702, it is a court's duty to play gatekeeper with respect to expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Indeed, Rule 702 mandates that the proponent of the expert testimony show it is "not only relevant, but reliable." *Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 246 (D.D.C. 2018) (citing *Heller v. District of Columbia*, 801 F.3d 264, 271 (D.C. Cir. 2015)). "In conducting this inquiry, 'trial judges [must] focus on experts' 'principles and methodology, not on the conclusions that they generate.'" *United States v. Day*, 524 F.3d 1361, 1368 (D.C. Cir. 2008). As explained below, Defendants cannot show that Mr. Upchurch's opinions satisfy all four elements in 702, so he does qualify as an expert in this case. Specifically, this Court should (A–E) exclude all five specific conclusions Mr. Upchurch offers in his report, and (F) disqualify him as an expert.

### A. Mr. Upchurch's First Conclusion Fails All Four Elements of Rule 702 Because He Ignored Contrary Evidence and Provides No Scientific Basis for It

Defendants are unable to show that Mr. Upchurch's first conclusion satisfies Rule 702 because he ignored conflicting evidence and did not apply scientific methodology. Mr. Upchurch's first conclusion states:

> 1. Although the plaintiffs claimed to have observed widespread, recurring contamination in the Residence after the Lambright insulation removal and replacement project had been completed, no documentation of such widespread, recurring contamination was found in the provided documents. Photographs taken on December 21 and 22, 2020 show light levels of dust on a toilet tank and bathtub (presumably in the same bathroom), and photographs taken on December 28, 2020 show a heavier level of dust on the top of the fire alarm below the attic access. None of the other approximately 250 photographs taken in the living spaces of the Residence by Ms. Zamd show visible dust or insulation debris.

Ex. 8, Upchurch Report, pp. 5–6. As is clear on its face, this conclusion is unrelated to any scientific expertise — it is merely an allegedly factual statement. Further, the statement itself — that there is "no documentation" in support of widespread, recurring contamination — is

demonstrably false because Plaintiffs produced: (1) contemporaneous emails to Defendants, Ex. 5, Email Exchanges Between L. Zamd and T. Lambright (December 21, 2020), Campbell000009–11; (2) an email Ms. Zamd sent to her HOA about the widespread contamination resulting from Defendants' actions, Ex. 9, Email from L. Zamd to HOA; (3) the letter from the Project Manager at Columbia Restoration noting his own observation of the widespread dust, Ex. 6, Ltr. From T. Beckwith, Columbia Restoration, to L. Zamd (December 30, 2020) Campbell000011–12; and (4) Plaintiffs' credible and unrebutted deposition testimony about the widespread, reoccurring contamination, *see, e.g.*, Ex. 3, J. Campbell Dep. 57:3–13; Ex. 4, L. Zamd Dep. 130:19–131:14. Thus, Mr. Upchurch's expert conclusion that there is "no documentation" of the widespread, recurring contamination ignores the breadth of evidence that Plaintiffs produced.

Mr. Upchurch unsuccessfully attempts to blur admissible evidence with his idiosyncratic definition of documentation. For example, when asked in his deposition why he did not include the Columbia Restoration letter (which, among other things, noted "distinct 'gritty' layer of dust/particulates . . . far beyond what would be expected in a home that is cleaned at least once/month and did not appear to be just regular dust"), or Plaintiffs' deposition testimony, Mr. Upchurch explained that his definition of "documentation" did not include all documentation:

> Q: It sounds like when you use the term documentation here in this opinion, you're really limiting it to photographs and testing — is that right?
>
> A: Yes.

Ex. 7, M. Upchurch Dep. 148:14–18. Mr. Upchurch never discloses his methodology for determining what counts as documentation, in clear conflict with *Daubert*, because "[t]he subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharms., Inc.*,

509 U.S. 579, 589–90 (1993). Confronted with his narrow, idiosyncratic definition of "documentation" that excludes many forms of actual documentation, Mr. Upchurch understood that his conclusion could be confusing but presumed "it would be clarified in examination." Ex. 7, M. Upchurch Dep. 149:3–9.

Stranger still is that Plaintiffs *do* have photos of the contamination, and Mr. Upchurch reviewed them. However, his report characterizes the photos as evidence of "light levels of dust" without explaining his definition of "light" or analyzing how previously clean surfaces were covered in any dust at all after LPC did their work. In short, Mr. Upchurch bases his conclusions on unsupported, subjective beliefs that lack methodology.

Light versus heavy dust aside, Mr. Upchurch admitted under oath that, contrary to what he stated in his report where he claims there was no [photographic] documentation of reoccurring contamination, Plaintiffs' photos taken on December 21 and 22, 2020, could be evidence of it:

> Q: So you had some photographs taken on December 21 and then some photographs taken on December 22 — is that right?
>
> A: That's what appeared to [*sic*] indicate from the photos.
>
> Q: Okay. And some of the photographs on December 22 shows dust, correct?
>
> A: Yes.
>
> Q: If the plaintiffs cleaned on December 21 and then dust showed up again on December 22, wouldn't that count as recurring contamination?
>
> A: It potentially could, yes.

Ex. 7, M. Upchurch Dep. 139:13–140:11.

Defendants cannot prove that Mr. Upchurch's first conclusion satisfies all four elements of Rule 702. Instead, the conclusion is unreliable and, therefore, must be excluded. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any

and all scientific testimony or evidence admitted is not only relevant, but reliable."). Federal courts in this district and across the country agree that selective facts and lack of methodology eviscerate a report's reliability because it is "not based on any particular facts, data, scientific principles or methods." *Window Specialists, Inc. v. Forney Enterprises, Inc.*, 106 F. Supp. 3d 64, 87 (D.D.C. 2015). Court cases are replete with the rejection of self-serving conclusions where the purported expert "picked out the pieces of data she preferred and found convenient reasons to ignore the rest of the data, which is contrary to the generally accepted method of conducting a weight-of-the-evidence analysis." *In re Lipitor (Atorvastatin Calcium)*, 185 F. Supp. 3d 761, 782–83 (D.D.C. 2016); *see also Barber v. United Airlines, Inc*., 17 Fed. Appx. 433, 437 (7th Cir. 2001) ("Because, in formulating his opinion, Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert*."); *In re Bextra Celebrex Mktg. Sales Practices*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert testimony where the expert "reaches his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion"). These cases mirror Mr. Upchurch's unscientific approach. Because Defendants cannot show that Mr. Upchurch's first conclusion satisfies any, much less all of the requirements under Rule 702, this Court should exclude it.

**B. Mr. Upchurch's Second Conclusion Fails All Four Elements of Rule 702 Because He Ignored Contrary Evidence to Arrive at His Conclusion**

Defendants are unable to show that Mr. Upchurch's second conclusion satisfies all four elements of Rule 702 because it is merely a factual statement, cherry-picks evidence that purports to support his claims, and simultaneously excludes relevant evidence that conflicts with it. Mr. Upchurch's second conclusion states:

> 2. Plaintiff Liza Zamd reported that she visited the upper levels of the Residence and took photographs of the attic space before the original fiberglass batt insulation was removed and immediately after it was removed, but did not report having any adverse health effects or observing any odors during those visits. Ms. Zamd also reported that she visited the attic space after new TAP® insulation was installed by Lambright and did not report observing any odors in the attic. Lack of reported adverse health effects and/or odors during these visits contradicts that contamination from the removed insulation was the source of odors reported by the plaintiffs.

Ex. 8, Upchurch Report at 5. For this second conclusion, Mr. Upchurch embraces a portion of Ms. Zamd's deposition yet ignores other probative parts of her testimony. Mr. Upchurch's second conclusion is based on the fact that Ms. Zamd said that when she went to the attic in the middle of the day to take pictures, she did not recall any odors in the few seconds she was on the third floor (before entering the attic) or experience any adverse health-effects in those brief moments. LZ Dep. However, he excluded the facts that: (1) Ms. Zamd testified that she was wearing an N-95 mask when she was briefly on the third floor and in the attic, Ex. 4, L. Zamd Dep. 45:15–17, 67:16–18, and (2) Ms. Zamd testified to having a poor sense of smell. Ex. 4, L. Zamd Dep. 46:4–7. Mr. Upchurch also makes several assumptions that he did not disclose in his report and that run contrary to the facts. Because his report cherry-picks facts and makes undisclosed and unfounded assumptions, Defendants fail to meet the four elements required in Rule 702.

With respect to Ms. Zamd wearing an N-95 mask, Mr. Upchurch never mentioned it in his report. Then, in his deposition, he said that the N-95 mask does not filter out gaseous odors, but admitted that they would filter out the mold, mouse-allergens, and fiberglass-dust — the very things Plaintiffs' expert believes are the likely cause of the smell Plaintiffs reported and their health-symptoms. Ex. 7, M. Upchurch Dep 158:13–159:5. The flaw in Mr. Upchurch's reasoning is that Plaintiffs are not alleging that the dust and contaminants were in gaseous form. Instead, Plaintiffs' expert's report — which Mr. Upchurch claimed to have read — stated that the smell

came from dust-particles that the mold and mouse-murines attached to. Ex. 10, D. Dickerson Expert Report, 7–9 ("Some compounds produced by molds *have strong smells* and are volatile and quickly released into the air. . . . [Contaminants] in the gaseous state *will adsorb to dust particles* in the indoor environment and are thus transported through the air spaces . . . . Mouse urine protein has been found *to adsorb to dust particles* and become airborne.") (emphasis added). Later in his deposition, the flaw in his unstated analysis is laid bare when he admits that the types of particulates that Plaintiffs' expert allege carried the odor — mold, fiberglass, and mouse-allergens on dust-particles — are blocked by an N-95 mask.

> Q: I see. So you consider N-95 sufficient for mold and fiberglass — is that right?
>
> A: Yes.
>
> Q: Is it sufficient for mouse-allergens?
>
> A: I would presume so if they're attached to particles that are bigger than that. Again, you know, the allergens are typically part of the urine, the feces, or they're sitting on other particles that are bigger than that.

Ex. 7, M. Upchurch Dep. 96:7–19. A few minutes later, he more directly acknowledged the point:

> Q: And then do you believe that mouse-allergens having absorbed to dust-particles can become airborne?
>
> A: They potentially can, yes.

Ex. 7, M. Upchurch Dep. 123:14–17. Thus, Mr. Upchurch admitted that mold, fiberglass, and mouse-allergens on dust can be blocked by an N-95 mask, but that was not something he ever acknowledged in his report. Similarly puzzling is Mr. Upchurch's failure to consider Ms. Zamd's poor ability to perceive odors. As she explained in her deposition, her sense of smell is not very good, and it was her sensitive lungs — not the third floor's smell — that she first noticed when returning there after LPC finished its attic work. Ex. 4, L. Zamd Dep 46:2–11. When, in his deposition, Mr. Upchurch was confronted with the prospect of Ms. Zamd having a poor sense of

smell, he admitted that his conclusion could be affected:

> Q: If she has a weak sense of smell, that would affect her ability to smell both before and after the fiberglass was removed, right?
>
> A: I would presume so, yes.
>
> Q: And it would affect her ability to smell immediately after and then also later that evening, right?
>
> A: I would presume it would be the same.
>
> [ . . . ]
>
> Q: I guess what I'm trying to say is, is it possible that there was odor immediately after the fiberglass insulation was removed that Ms. Zamd did not smell?
>
> A: That's potentially the case.

Ex. 7, M. Upchurch Dep. 159:13–160:11. So, in his deposition, Mr. Upchurch acknowledged reasons why Ms. Zamd might not have smelled anything for the brief period she was on her third floor in the middle of the day on December 21, 2020. Yet, Mr. Upchurch's report never considered them, nor did he disclose in his report the possible weaknesses to assumptions, thus undermining his second conclusion.

Similarly, Mr. Upchurch did not consider the fact that Plaintiffs' double juliet doors were open in the room where LPC threw down the unbagged insulation. Instead of acknowledging the lack of information in his report, or analyzing both the open- and closed-door possibilities, he just assumed (without disclosing his assumption in the report) that the doors were closed:

> Q: Well, then why did you not include that fact of the open doors in your opinion?
>
> A: **Because I don't know the time periods when all of this was taking place. I presume those weren't open when she was in the attic before**. They were closed at some point after everything was installed and there was no statement that there was an odor at that point.

Ex. 7, M. Upchurch Dep. 165:9–16 (emphasis added).

> Q: But again, if it's about dissemination of chemicals, then isn't it a really critical fact that the Juliette doors were open?
>
> A: **That's something that could be considered. But again, I don't know the extent of how long those were open or closed. That might have been a factor. But again, at some point they were closed. I don't know if they were closed in between removing and reinstalling.**

Ex. 7, M. Upchurch Dep. 168:18–169:4 (emphasis added). The importance of this fact cannot be understated: Mr. Upchurch failed to consider, much less analyze, the effect of odor-dissemination on someone with a poor sense of smell or when two full-sized doors are open. The conclusion in Mr. Upchurch's report is not evidence of expertise and is instead just an example of unfounded hypotheses in written form.

As noted before, Defendants must establish an expert's admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). Defendants have not met this burden, nor can they, because Mr. Upchurch excluded relevant proof to arrive at his conclusions. This upends the point of an expert because "testimony under Rule 702 is admissible if it 'rests on a reliable foundation and is relevant.'" *Equal Emp't Opportunity Comm'n v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015). And, as the *Freeman* court explains, it is the court's job to "evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Id.* However, when "there is simply too great an analytical gap between the data and the opinion offered," courts must exclude it. *Id.*

Because Defendants cannot show that Mr. Upchurch's second conclusion satisfies each of four required elements of Rule 702, this Court should exclude it.

### C. Mr. Upchurch's Third Conclusion Fails All Four Elements of Rule 702 and Is Merely a Statement of an Irrelevant Fact

Mr. Upchurch's third conclusion is undisputed, not based on any scientific methodology,

and merely a statement of an irrelevant fact that this Court can assess on its own:

> 3. No evidence of contamination in the Residence due to activities performed by Lambright were observed by Arc or indicated to be present by the Arc sample results.

Ex. 8, Upchurch Report, p. 5. The Arc report speaks for itself and does not require any expertise to understand that Arc employees — who, as reflected in the report, came to Plaintiffs' home to conduct their testing in 2022 — were therefore not witness to LPC's activities over a year before. Ex. 11, Arc Environmental Report, p. 1. Thus, Mr. Upchurch's third conclusion is not an expert opinion; it is factual evidence any lawyer can direct this Court to. Further, the conclusion does not purport to be based on any scientific methodology; it simply announces a fact that this any reader can reach on its own by reading the Arc report.

Because Defendants cannot show that Mr. Upchurch's third conclusion satisfies each of four required elements of Rule 702, this Court should exclude it.

**D. Mr. Upchurch's Fourth Conclusion Fails All Four Elements of Rule 702 Because He Ignored Contrary Evidence and Fails to Support His Conclusion with Any Scientific Evidence**

Defendants cannot show that Mr. Upchurch's fourth conclusion satisfies all four elements of Rule 702. The fatal flaws with his fourth conclusion are that he excluded relevant evidence in conflict with his conclusion and failed to apply scientific rigor. Mr. Upchurch's fourth conclusion states:

> 4. The "moderately elevated" level of mold reported by Arc was more likely than not due to mold growing on plants than building materials or claimed contamination from the attic-insulation removal.

Ex. 8, Upchurch Report at 5. How does Mr. Upchurch arrive at his conclusion? He does so only by imagining evidence and ignoring reality.

First, and most tellingly, Mr. Upchurch did not consider that Ms. Zamd owned the same plants for years before LPC's work and for years after. Ex. 12, L. Zamd Dec. ¶ 27, Ex. 13, J.

Campbell Dec. ¶ 20. Second, Mr. Upchurch was not in a position to make any determination about mold on Plaintiffs' plants because he admittedly knows nothing about them:

> Q: In this conclusion you conclude that this elevated level of mold was more likely than not due to mold growing on plants. How many plants were on the third floor of the plaintiffs' home at the time of the ARC Environmental report?
>
> A: **I have no idea**.
>
> Q: Do you know how big those plants were?
>
> A: **I said I have no idea**.
>
> Q: Do you know what kind of plants they were?
>
> A: **No, I don't**.
>
> Q: How many plants do you think there would have had to be to produce the elevated level of mold that are purported?
>
> A: **I don't know how many plants it would have taken**.

Ex. 7, M. Upchurch Dep. 173:7–22 (emphasis added). Mr. Upchurch's opinion about Plaintiffs' plants causing their mold issue is nothing more than *ipse dixit*. Not only is he missing the how, but he cannot explain *why* he determined that Plaintiffs' plants were the culprit — as opposed to Plaintiffs' towels, cutlery, or any other household item they possessed for years before and after LPC's work. Also telling is that Arc Environmental's report noted three observations on its first page, including that in Plaintiffs' home, "[n]o sign of suspect microbial growth were observed during the site visits." Ex. 11, Arc Environment Report, pp. 1–2. Because Plaintiffs owned the same plants from when LPC performed its work to the time of Arc Environmental's visit, Ex. 12, L. Zamd Dec. ¶ 27, Ex. 13, J. Campbell Dec. ¶ 20. Mr. Upchurch should have explained how the lack of observed mold on the plants was consistent with the alleged mold on Plaintiffs' plants causing their symptoms. Unsurprisingly, Mr. Upchurch could not explain how he arrived at the idea that Plaintiffs' plants were "more likely than not" the source of the mold. In fact, it seems

implausible for Mr. Upchurch to reasonably make such a conclusion given that he "has no idea" as to the number, size, or type of plants Plaintiffs had, or how many plants would need to be present to support the level of mold that could cause Plaintiffs' health-symptoms. Ex. 7, M. Upchurch Dep. 173:7–22

Even the two scientific articles Mr. Upchurch read — one relating to mice, another relating to mold-growth on plants — provide no support for his claims. Indeed, the mold-article could not be relevant because it describes mold-growth on wallpaper, silicone rubber, and malt extract agar, which are unrelated to Mr. Upchurch's guess that mold was growing on Plaintiffs' plants. The irrelevance of the articles may be the reason why Mr. Upchurch never claimed that the articles formed a foundation for his conclusions, but that fact only confirms that the articles are not relevant. *See, e.g.*, *Meister v. Med. Eng'g Corp*., 267 F.3d 1123, 1129 (D.C. Cir. 2001) ("Regarding the literature that [the expert] reviewed, [he] did not testify that any of the studies had actually concluded [findings similar to his]").

Because Mr. Upchurch's opinions are "connected to existing data only by the *ipse dixit* of the expert," the opinions are unreliable and should be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Like other disqualified experts, Mr. Upchurch "offers no factual support for his conclusions, nor any foundation in scientific evaluation or analysis . . . [or] ever refer[s] to a treatise, manual, study, or any other source of scientific data that might support his [conclusion]. *Sacchetti v. Gallaudet Univ.,* 344 F. Supp. 3d 233, 246 (D.D.C. 2018). This Court has excluded an expert who similarly lacked experience, had not reviewed relevant information, and thus had an insufficient factual or data-driven basis for his conclusion. *Garcia v. GGI Glass Distribution Corp*., No. CV 22–632 (TJK), 2024 WL 4253161, at *3–6 (D.D.C. Sept. 19, 2024). So too should this Court make such a finding here, given that Mr. Upchurch did not provide any scientific or

specialized knowledge, did not base his testimony on any facts or data, and did not use reliable principles or methods. In short, Defendants cannot prove that Mr. Upchurch's fourth conclusion satisfies all four standards required in Fed. Rule Evidence 702, so this Court should exclude it.

### E. Mr. Upchurch's Fifth Conclusion Fails All Four Elements of Rule 702 Because He Ignored Contrary Evidence, Failed to Support His Conclusion with Any Scientific Evidence, and Disqualified Himself as an Expert

Defendants cannot show that Mr. Upchurch's fifth conclusion satisfies all four elements of Rule 702 because he excluded relevant evidence in conflict with his conclusion, failed to support his conclusion with any scientific rigor, and disqualified himself as an expert. Mr. Upchurch's fifth conclusion states:

> 5. Lacking such testing or analysis for insulation debris, MVOCs or murine antigens, and based upon the lack of odors being present in the attic area during Ms. Zamd's visits prior to new insulation being installed, there is no evidence that the insulation removal activities performed by Lambright were the cause of the odors or adverse health effects reported by the plaintiffs. In addition, no other potential source(s) of the odor or cause of any reported adverse health effects were identified by the plaintiffs or their expert.

Ex. 8, Upchurch Report , p. 5. This fifth conclusion includes problematic elements Plaintiffs assail above: flaws with Mr. Upchurch failing to consider Ms. Zamd's use of an N-95 mask, Ms. Zamd's poor sense of smell, the open juliet doors; and ignoring of the probative evidence Plaintiffs produced in this case. However, with the new elements in his conclusion — the discussion of murine (mouse) antigens and an assessment of Plaintiffs' health-symptoms — Mr. Upchurch saves Plaintiffs the trouble of pointing out his lack of expertise because he readily admitted to it himself.

Specifically, when asked in his deposition whether he agreed with the scientific article's statement that there is no rigid acceptability threshold for mouse-antigens, he stated he could not agree or disagree because it was "outside my area of expertise." Ex. 7, M. Upchurch Dep. 102–103. In fact, when confronted with the implication that the article could help Plaintiffs' claims, he stated again he could not answer questions about the mouse-allergen article's conclusion because

it was outside of his expertise. Ex. 7, M. Upchurch Dep. 102:16–104:17. Similarly, when asked whether he agreed with the Plaintiffs' expert that "any exposure" to mouse-allergens might be harmful, he replied that it was "outside my area of expertise, so really I have no opinion on it." Ex. 7, M. Upchurch Dep. 103:10–17. Lest there be any lingering doubt about how ill-equipped he is to answer these types of questions, when asked about Plaintiffs' expert's conclusions relating to mouse-proteins, Mr. Upchurch stated "Again, this is more medical than my area of expertise." Ex. 7, M. Upchurch Dep. 118:14–119:8; 120:4–8.

Similarly, Mr. Upchurch disqualified himself when discussing that "no other potential source(s) of the odor or cause of any reported adverse health effects were identified by the plaintiffs or their expert" because he repeatedly stated that he cannot evaluate or opine on health-effects. Ex. 7, M. Upchurch Dep. 115:9–120:8 (noting five separate times that issues Plaintiffs' expert opined on were outside of Mr. Upchurch's area of expertise). To the same end, when asked about Plaintiffs' expert's scientific support relating to Plaintiffs' health symptoms, he stated that he cannot opine at all:

> Q: Is it possible that there's information in the literature Dr. Dickerson noted in her expert report that would link the plaintiffs' symptoms to mouse allergens?
>
> **A: I suppose that might be the case but, again, I'm not a medical expert so I don't know what documents discussing medical cause and effect that I would be able to discuss or what would be in there.**

Ex. 7, M. Upchurch Dep. 239:6–14 (emphasis added). Again, he disqualified himself from opining on key issues, so this Court should not hesitate to disqualify him as well.

Even if Mr. Upchurch had not admitted to his own disqualification, his general lack of knowledge in key areas is analogous to that of the disqualified experts in *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1125–26 (D.C. Cir. 2001) and *Garcia v. GGI Glass Distribution Corp.*, No. CV 22–632 (TJK), 2024 WL 4253161, at *5 (D.D.C. Sept. 19, 2024). In *Meister*, a case involving

a plaintiff's failed breast implants, the court disqualified both of her medical doctor experts; for one expert, because he "didn't know too much about breast implants" before treating the plaintiff, and for the other doctor, because he had "no particular training or expertise in rheumatic diseases or immunology" and had never published any papers on them. *Meister* at 363. The court found that despite the fact that both doctors had published dozens of medical studies in other areas (something Mr. Upchurch has not done), their lack of experience with the issues in the plaintiffs' case, coupled with the *ipse dixit* nature and unreliability of their testimony, required the court to exclude them. *Id.* at 364. Similarly, in *Garcia*, this Court excluded an expert due to lack of training, background, literature review, and unreliability his conclusory statements. *Garcia* at *3–6.

Like the disqualified experts in those cases who had no specific expertise in the litigated area, Mr. Upchurch has never had a matter involving the intersection of fiberglass-insulation with mold. Ex. 7, M. Upchurch Dep. 49:22–50:12 ("Q: This would be the first case you've worked on that includes both mold and fiberglass as the main targets of litigation? A: I believe so, yes."). It is therefore not surprising that he similarly "offers no factual support for his conclusions, nor any foundation in scientific evaluation or analysis" and does not "ever refer to a treatise, manual, study, or any other source of scientific data that might support" his report. *Sacchetti v. Gallaudet Univ*., 344 F. Supp. 3d 233, 246 (D.D.C. 2018). Thus, while Mr. Upchurch may have some general expertise in other areas of industrial hygiene, his opinion is not reliable in this matter because it was "not based on any particular facts, data, scientific principles or methods." *Window Specialists, Inc. v. Forney Enterprises, Inc*., 106 F. Supp. 3d 64, 87 (D.D.C. 2015). Therefore, this court should exclude the fifth conclusion in Mr. Upchurch's report because Defendants cannot prove that it satisfies any of the four necessary elements of 702.

### F. Mr. Upchurch's Does Not Have the Necessary Expertise in this Case, so this Court Should Exclude His Testimony in Its Entirety

Mr. Upchurch's report and deposition demonstrates the greatest hits of the reasons why courts disqualify experts: he lacks background in the relevant substantive area, he ignores contrary evidence, he cherry-picks data to fit his conclusions, he does not base his opinion on scientific methods, he does not support his opinion with any generally accepted articles, and he disqualifies himself by claiming a lack of expertise. In short, Defendants have failed to show how Mr. Upchurch can, "by knowledge, skill, experience, training, or education," base testimony on "reliable principles and methods," "base[] testimony on sufficient facts or data" and conduct a "reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

For the same reasons that Defendants cannot prove that the conclusions in Mr. Upchurch's report satisfy all four required elements of Rule 702, this Court should disqualify him as an expert. As is clear from his deposition, he entered this matter unable to satisfy Rule 702 in this case because of a lack of training or background in a key area, and then he further aggravated his lack of expertise by failing to do a literature review, two factors that doomed the disqualified expert in *Garcia*. 2024 WL 4253161, at 3–6 (D.D.C. Sept. 19, 2024). *See* Ex. 7, M. Upchurch Dep. 49:22–50:12 ("Q: This would be the first case you've worked on that includes both mold and fiberglass as the main targets of litigation? A: I believe so, yes."); Upchurch Dep. 211:22–212:14 (Q: Is it possible that one or more of [Plaintiffs' experts'] articles draws a connection between the mold in the Plaintiffs' home and the fiberglass-insulation removal and the Plaintiffs' symptoms? A: Potentially. . . . Q: You don't know because you didn't read those articles? A: Correct.").

"[D]istrict courts are not obligated to prune away all of the problematic elements of an expert's proposed testimony to save the remaining portions, however small." *Garcia v. GGI Glass Distribution Corp.*, No. CV 22–632 (TJK), 2024 WL 4253161, at *2 (D.D.C. Sept. 19, 2024)

(citing *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016)). Similarly, courts cannot allow the *ipse dixit* testimony of an inexperienced expert to "fill the void." *See e.g.*, *Meister*, 267 F.3d at 1126, 1132. For the reasons stated above, Defendants cannot prove that Mr. Upchurch qualifies as an expert under Rule 702, so this court should exclude his testimony.

## IV. Conclusion

Defendants have the burden of proving that Mr. Upchurch's five conclusions and his background and expertise satisfy Rule 702, but they cannot meet any such requirements. Instead, it is clear from Mr. Upchurch's report and deposition that his "opinion does not reflect scientific knowledge, is not derived by the scientific method, and is not 'good science'; it is therefore inadmissible." *In re Bextra Celebrex*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007). For these reasons, this Court should grant Plaintiffs' Motion or grant a hearing if additional argument would be of use.

Respectfully submitted,

*/s/ Phil Telfeyan*
Phil Telfeyan
D.C. Bar No. 1029157
400 7th Street NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
phil@telfeyan.love
*Attorney for Plaintiffs*

**Certificate of Service**

I hereby certify that on December 5, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered counsel.

*/s/ Phil Telfeyan*
Counsel for Plaintiffs