# Exhibit 7

## Martin Upchurch Deposition Excerpts

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------------x

JOHN CAMPBELL and LIZA ZAMD, :

Plaintiffs, : Case No.:

v. : 1:23-cv-1132 (TJK)

LAMBRIGHT PEST CONTROL SERVICES, :

INC. and TYRONE LAMBRIGHT, SR. :

Defendants. :

---------------------------------x

Deposition of Martin E. Upchurch

Held remotely

Friday, August 16, 2024

10:01 a.m.

Job No.: 547277

Pages: 1 - 244

Transcribed by: Debra McCostlin

industrial hygienists might get into that, but I don't get into those situations.

Q How long have you been in this role?

A I started as an industrial hygienist in 1989. I've been a certified industrial hygienist I think since 2004, give or take a year. I don't remember the exact year of that. It's been a while.

Q Is that certification something that happens once? Is it renewed?

A Yes. We have to renew it every -- there's a five-year renewal cycle where we have to submit our continuing education documentation or I think I met one gentleman that in lieu of doing the continuing education you can just retake the exam every five years, but I choose to do the continuing education to maintain my certification. We also have to pay a fee every year to maintain it, but the actual recertification is every five years.

Q When was the last time you took the exam?

hygienist you have to have an applicable degree, which is either some type of science or engineering. That's specified in the board that does the certifying. That is a -- you don't have to have an advanced degree. You have to have at least a bachelor's degree, again, in some kind of science or engineering. Before you can take the exam you have to submit your college transcript, you have to submit some references from people that have worked with you, information on your experience before you're even allowed to take the exam.

Q And what is your bachelor's degree in?

A It's in architectural engineering.

Q When did you earn that?

A That was in 1987.

Q From what school?

A The University of Kansas.

Q Do you have any advanced degrees?

A No, I don't.

Q Mr. Upchurch, have you been deposed before?

Zoom?
A Yes.
Q Is there any reason that this media would interfere with your ability to testify truthfully?
A No.
Q How many papers have you published in the past ten years?
A I haven't published any papers.
Q Now, you talked about testifying 20 to 30 times before. How many times have you testified as an expert industrial hygienist?
A All of those -- all of my testimony has been as an industrial hygienist.
(Exhibit 1 was marked for identification and was retained by counsel.)
Q I'm going to go ahead and mark as Exhibit 1 and pull up on a screen share your expert report. And actually, Mr. Upchurch, so we can -- well, is it easier for you if I share the screen or if you just pull up the expert report, your own expert report?

other matters where fiberglass has been present and a potential issue but that was not what I was retained to be specifically addressing.

Q How often when you're retained does your work lead to actual testimony?

A Not very.

Q What percentage?

A Probably less than ten percent of the matters I get retained on get to a point where I'm actually having to testify.

Q Approximately what percent of the matters you get retained on does your work lead to an expert report like the one you signed in this case?

A Probably a half to two-thirds. It just depends on what the client is really looking for and needing.

Q So sometimes -- it sounds like maybe a third to half the time you're retained and there's no report or testimony, it's more just consulting?

A I think that's fair, yes.

Q Thinking of those cases that you've

worked on that have involved fiberglass insulation, have any of them involved mold?

A I don't think any of those matters that were specific fiberglass also had mold. I've had a lot of other matters that were specifically mold or claims of mold or potential mold, but not that overlap with something specific to do with fiberglass.

Q This would be the first case you've worked on that includes both mold and fiberglass as the main targets of litigation?

A I believe so, yes.

Q Thinking about the cases you've worked on involving fiberglass insulation, how many involved mouse urine and mouse droppings?

A I think I've only had one matter where part of the retention was specifically due to claims of mouse urine and feces contamination, but that was not a fiberglass or a mold case, that was specifically to alleged mice presence and contamination. Again, I've been on a lot of projects/inspections where I've run across that,

the mold industry. They generally are bigger than that but, again, the N95 isn't necessarily tightly fitting so there's issues with things being sucked around the edges. But generally N95s are considered sufficient for mold as well.

Q When you say as well, do you mean N95s are considered sufficient both for mold and mouse allergens?

A I wasn't addressing the mouse allergen. I was thinking like fiberglass and mold.

Q I see. So you consider N95 sufficient for mold and fiberglass; is that right?

A Yes.

Q Is it sufficient for mouse allergens?

A I would presume so if they're attached to particles that are bigger than that. Again, you know, the allergens are typically part of the urine, the feces, or they're sitting on other particles that are bigger than that.

(Exhibit 3 was marked for identification and was retained by counsel.)

Q Mr. Upchurch, I'm going to mark as

A Yes.
Q Do you agree that homes where there is evidence of mice, such as droppings, are more likely to have higher levels of mouse allergens than homes without such evidence?
A That would make sense to me.
Q Okay.
A I don't have any other source that would refute that.
Q I want to go back to the Executive Summary near the beginning of this article. So the third paragraph of the Executive Summary begins, It is important. Do you see that paragraph?
A Yes.
Q The first couple sentences read, It is important to recognize that exposure to a specific concentration of rodent allergen should not be interpreted to represent a rigid clinical threshold. Allergen levels associated with an increased risk of sensitization or disease may instead represent artifacts related to specific

characteristics of a study population and to the distribution of allergen levels in their environments and to their prevalence of sensitization or disease. Do you agree with this assessment?

A I mean, this is more medical. It's outside my area of expertise. I don't know of anything that would refute this, but it's not my area of expertise.

Q At the end of that same paragraph we were looking at it reads, it is possible that a more linear or even sigmoidal type of relationship exists between exposure and morbidity which could mean that any amount of exposure might potentially be harmful. Do you agree with this statement?

A Again, this is outside my area of expertise, so really I have no opinion on it.

Q Around page 6 or 7 there's a heading that says, Aerodynamic and Environmental Properties. Can you let me know when you find that heading?

A I've got that.

Q Okay. This section is talking about mouse allergens still. So it's a few paragraphs down from where we were talking about the homes with mouse allergens and now it's getting to the aerodynamic environmental properties of mouse allergens. The second sentence says that mouse allergens are, I'll start quoting, carried on small and large particles and has the ability to migrate throughout a building. Do you agree with that statement?

A I don't know of anything that would refute that. I don't know --

Q Was there more that you wanted to say, Mr. Upchurch?

A No, I was just re-reading it. I'm sorry. Yeah, I don't know of anything that would refute that.

(Exhibit 5 was marked for identification and was retained by counsel.)

Q Now let's look at the document, Emissions of Fungal Volatile Organic Compounds in Residential Environments. I'll mark this as

choose these documents to rely upon for your expert report?

A The only one I recall specifically was the TAP insulation. I believe the other two may have been referenced in other documents that I referred -- or I reviewed. I don't recall any reason that I would have pulled these specific ones up other than they were referenced somewhere and I just wanted to get familiar with them.

Q So why did you pull the TAP insulation report?

A Again, that was -- it's my understanding that was the new insulation that had been installed. I wasn't familiar with that insulation at all. I wanted to know what it was, what its constituents were.

Q So now looking at Dr. Dickerson's report, she refers to a number of other articles starting on page 4, continuing on to 5 and 6 of her report. Do you see that list? The heading is Standard Guidelines and Scientific Literature under Basis for Opinions.

a medical conclusion and that's not something that -- that's outside my area of expertise and I don't know if that's within her area of expertise.

Q Is fungus included in this second opinion?

A It typically is. It's part of -- the microbial is typically including VOCs from funguses as they are growing and metabolizing.

Q Does human exposure to mouse urine and mouse poop cause the type of symptoms that the plaintiffs experienced?

A Again, that's medical discussion which is outside my area of expertise.

Q Well, let's look at page 7, Bates number 862, of Dr. Dickerson's report.

A I'm on page 7.

Q Let me find the specific section where she writes. She elaborates on Opinion 2 here on page 7 in a paragraph and toward the end of that paragraph she says that MVOCs and murine antigens are causative agents of the symptoms experienced by the plaintiffs. Do you have any reason to

disagree with this?

A Again, that's a medical opinion. That is outside my area of expertise.

Q Toward the bottom of page 7, the last full paragraph, Dr. Dickerson writes, The health effects of exposure to MVOCs include symptoms such as headaches, nasal irritation, dizziness, fatigue, and nausea. Do you have any reason to disagree with this statement?

A Again, that's medical in nature. That's outside my area of expertise.

Q What about the next sentence? She says in the very next, sorry, in the next paragraph -- the next paragraph includes her learning MVOCs in a gaseous state will absorb to dust particles in the indoor environment and are thus transported through air spaces. These authors, Wady and Larson, also demonstrated that MVOCs absorb significantly to gypsum board and then undergo a process of absorption/desorption where the chemicals stick to the wall board and continuously off-gas in the indoor air. Do you

have any reason to disagree with this statement?
A Yeah, I don't have any specific information that would lead me to disagree with that specific statement.
Q Is this specific statement within your area of expertise?
A In general, part of what we study is like when sampling how samples are collected they can be adsorbed or absorbed onto materials. So in general, understanding that things can be absorbed into materials and then off-gassing is something that is touched on in industrial hygiene.
Q That process of off-gassing, does that mean that a contaminant can absorb into, for example, drywall? Or hide in the drywall but then also be released back into the air and then go back in the drywall, have this sort of cycle of going in drywall and back in the air? Is that what that process is describing?
A Generally, yes. And as it goes on, generally what gets released into the air is less each time because part of what gets released goes

into the general air and ventilation. It just keeps getting diluted over time. It's part of one of the reasons like when we're sampling we collect samples in certain ways to make sure that we collect on our sample media is trapped on the media so we can get it back to the laboratory to get an accurate reading on what was actually there at the time of sampling.

Q Turning to page 8, which might be the page you're still on, of Dr. Dickerson's report, which is Bates number 863, the heading, Mouse Urine Protein. Do you see that heading?

A Yes.

Q The second sentence underneath that heading says, Mouse allergen exposure is a well-recognized risk factor for allergic sensitization and asthma in occupational settings. Do you agree with this statement?

A I don't have anything specific that would refute that.

Q Is this statement within your area of expertise?

A Again, this is more medical than my area of expertise.
Q What does allergic sensitization mean?
A I don't know specifically. I believe it is that the more you're exposed to something the more sensitive you might become to that. And talking about allergens again, so this would be talking things that trigger allergies.
Q What does risk factor mean?
A It's something that contributes to risk.
Q That makes the risk higher?
A Potentially or creates a potential risk.
Q But you wouldn't describe something that lowers a risk as a risk factor; is that right?
A I typically wouldn't. You perhaps could, but not typically.
Q Turning to page 9 of Dr. Dickerson's expert report. The second full paragraph begins, Symptoms of exposure. Do you see that?
A Yes.
Q I'm going to save Mr. Sullivan some scientific words here and just -- do you see how

Dr. Dickerson lists symptoms of exposure to mouse urine?

A Yes.

Q Do you have any reason to disagree with what she describes as the symptoms of exposure to mouse urine?

A Again, this is medical, outside of my area of expertise.

Q At the very end of this page, I'm sorry, the very next paragraph on the same page Dr. Dickerson writes, Mouse urine protein has been found to absorb to dust particles and become airborne. This is of particular importance to the case at hand as there seem to be distribution of the dust throughout the residence, particularly on the upper living floor or the third floor. Do you have any reason to disagree with this paragraph?

A Just that, again, there was no evidence documenting contamination dust distribution. There were allegations but I didn't see any actual documentation of that being the case.

Q When you say documentation versus

homes in one had detectable mouse allergen in settled dust. Do you see that sentence?
A Yes.
Q Do you agree with that statement in this report?
A I have no independent knowledge of, you know, the study or where this was coming from. So I agree that that is what it said. I don't have any knowledge that that is correct or not.
Q Do you agree that mouse allergens can absorb to dust particles?
A Yes, I believe that they potentially could, yes.
Q And then do you believe that mouse allergens having absorbed to dust particles can become airborne?
A They potentially can, yes.
Q Now if we go back one page to page 8 of Dr. Dickerson's report. See around the middle of that page there's a heading, Mouse Urine Protein. Do you see that heading?
A Yes.

it.

MR. WHITE: And just for clarification, I've got page 5 that that's on.

MR. TELFEYAN: Thank you, Britton. That's --

MR. WHITE: All right.

MR. TELFEYAN: Yes, that's right.

Q I'm sorry, Mr. Upchurch. The first conclusion starts on the bottom of page 5 and goes on to page 6 of your report, Mr. Upchurch. That's the one I'm going to ask about.

A Okay. I've read over that one.

Q Okay. So this conclusion is describing -- at some point you say there was no documentation to show widespread contamination. So I want to talk about types of documentation. Is that okay?

A Yes.

Q So photographs, would you agree, are one type of documentation?

A I agree.

Q So you had some photographs taken on

December 21 and then some photographs taken on December 22; is that right?
A That's what I appeared to indicate from the photos.
Q Okay. And some of the photographs on December 22 shows dust, correct?
A Yes.
Q If the plaintiffs cleaned on December 21 and then dust showed up again on December 22, wouldn't that count as recurring contamination?
A It potentially could, yes.
Q Let's look together -- and I think that this -- well, I think screen share will be best for this, so I'm going to go ahead and share my screen because I'm going to pull up some photos. Can you see my screen, Mr. Upchurch, right now that's showing part of your report?
A Yes.
Q Okay. I will jump over to -- this is Bates 530 and in the top left of my screen it shows my file name which you'll notice has the Campbell 000530. Do you see that?

documentation. So what am I not understanding here?

A Well, it's documentation of statements but it's not documented showing -- you know, visibly showing or test results to backup what is being seen. It's a statement of their opinions but that doesn't mean their opinion is factual or not.

Q I see. They could be wrong or they could be lying. Is that kind of what you're saying?

A They could be incorrect in what they're saying, yes.

Q It sounds like when you use the term documentation here in this opinion, you're really limiting it to photographs and testing; is that right?

A Yes.

Q Why do you limit it in that way?

A Because photographs and testing are independent of just people's impressions. It's actually showing and demonstrating what's actually

there independent of just what someone's interpretation of what is typical or normal.

Q Well, if we were to put this statement before a judge, do you agree that the way you used the term documentation could be confusing?

MR. WHITE: Objection to form. You can answer.

A I suppose it could be, but I presume it would be clarified in examination.

Q Clarification is really by documentation, you mean photographs or testing, right?

A Correct.

Q So it would have been clearer if you had simply rephrased this portion of your opinion to say no photographs or testing showed the widespread or recurring contamination; is that right?

A Apparently so, yes.

Q Let me, while I still have my screen being shared, look at -- and I think I know the answer but I just want to ask to make sure. So we

conclusion, this bullet point here, I understood to be talking about her visits immediately after the fiberglass was removed, but you're saying -- like you're comparing two pieces of information. You're saying she didn't report odors in that instance but did report it separately. Is that now what you're saying?
A Yeah, she reported an odor being discovered later after the insulation had been reinstalled that evening, but not during the removal, not before the removal, not immediately after the removal.
Q Now, what if Ms. Zamd was wearing an N95 mask when she visited the attic immediately after the removal? Would that affect the strength of your conclusion?
A No.
Q Why not?
A I'm sorry? Did you --
Q I said, Why not?
A Oh, I'm sorry. N95s aren't designed to remove odors. They're just not capable. They're

filtering out particulates.
Q Doesn't smell require a particle?
A Most odors are more gaseous in nature. So that's not a particle, that's a gas which an N95 would not inhibit passing through.
Q Because the gas is smaller than the .3 microns that you mentioned earlier?
A Correct.
Q So if Ms. Zamd has a weak sense of smell, that would affect her ability to smell both before and after the removal, right?
A I'm sorry. Can you repeat that?
Q If she has a weak sense of smell, that would affect her ability to smell both before and after the fiberglass was removed, right?
A I would presume so, yes.
Q And it would affect her ability to smell immediately after and then also later that evening, right?
A I would presume it would be the same.
Q Okay. So what if the smell was stronger, strong enough so that she could smell it

at one point, does that discount the fact that there was still an odor that she couldn't smell at another point?

A I suppose it could be a factor that there may have been something that she couldn't have smelled earlier at a lower concentration.

Q I guess what I'm trying to say is, is it possible that there was odor immediately after the fiberglass insulation was removed that Ms. Zamd did not smell?

A That's potentially the case.

Q I'm also confused, if we connect these two discussions, the second point and the first point, the second point really relies heavily on observation of someone's senses whereas when we were talking about your first conclusion you really didn't want to count any observations. So why the different approach here?

A The complaint was initially that this strong odor was detected that evening, and that's a statement, but that statement contradicts that there was no odor detected before anything was

That means that hot inside air is going to be rushing outside with the doors open, right?
A Potentially, yes.
Q So could these open doors and the resulting airflow be a reason why Ms. Zamd did not smell anything?
A That could potentially contribute to what she smelled or how much she smelled.
Q Well, then why did you not include that fact of the open doors in your opinion?
A Because I don't know the time periods when all of this was taking place. I presume those weren't open when she was in the attic before. They were closed at some point after everything was installed and there was no statement that there was an odor at that point.
Q All I'm saying is the open doors, open Juliette doors, seems to be a relevant fact affecting the observation of odors, so shouldn't that fact be included in this opinion?
A Not necessarily. I'm just noting the times when odors were made and when they weren't

conclusion on page 6 of your report -- what, if any, aspect of your training, experience, or expertise do you draw on to make this?

A Well, it's noting that exposure to odors is strongest at the initial point of disseminating from whatever the source is and then the odors diffuse as things move around. Things get less strong over time. So at the point the source where the odor is emanating from is the point where the odor is strongest and then as you move further away from that or as things diffuse then the odors can get less.

Q So the expertise you're drawing on is your expertise about odors?

A About dissemination -- it's more like dissemination of chemicals and how things disperse in environments.

Q But again, if it's about dissemination of chemicals then isn't it a really critical fact that the Juliette doors were open?

A That's something that could be considered. But again, I don't know the extent of

how long those were open or closed. That might have been a factor. But again, at some point they were closed. I don't know if they were closed in between removing and reinstalling.

Q I'm going to jump over to page 28 of your report. Do you remember reviewing the ARC Environmental report?

A Yes.

Q So Mr. Upchurch, you wrote on page 28 of your report, ARC also collected air samples for boron and oil mist, which are reportedly constituents of the TAP insulation and surface samples for mouse allergens. Do you see that?

A Yes.

Q Can you explain what you mean by that sentence?

A Just stating that they reported that they collected air samples for boron and oil mist, which are reportedly constituents of the TAP insulation and surface samples for mouse allergens. That's describing samples that they collected and I believe it's specific to that

Q All right. So jumping back to your conclusions on page 6. Your third bullet on page 6, which is actually your fourth bullet across these pages, begins with this term moderately elevated. Do you see that?
A Yes.
Q In this conclusion you conclude that this elevated level of mold was more likely than not due to mold growing on plants. How many plants were on the third floor of the plaintiffs' home at the time of the ARC Environmental report?
A I have no idea.
Q Do you know how big those plants were?
A I said I have no idea.
Q Do you know what kind of plants they were?
A No, I don't.
Q How many plants do you think there would have had to be to produce the elevated level of mold that are purported?
A I don't know how many plants it would have taken.

rodent urine or feces is visible in the photographs. Do you believe that there was no mouse urine or mouse feces in the plaintiffs' attic insulation?

A I'm not saying there was none there. I was just saying that there's nothing that documented that presence or the extent of that.

Q What about the fact that even the defendants testified that they would not have been doing the job were it not for mice in the attic? Is that documented evidence that there was mouse urine and feces in the attic?

A That would support that statement, yes.

Q But you wouldn't count it as documentation of mouse urine or feces?

A Correct.

Q Even if it was an admission from the defendants?

A Even if it was from them, yes. There's no physical documentation. There are statements that I agree have been made.

Q All right. And looking back at the

previous bolded sentence about Dr. Dickerson not identifying evidence, we talked about she looked at photographs, she looked at tests, she looked at testimony. She also had 22 articles that you said you didn't feel the need to consult. Is it possible that one or more of those articles draws a connection between the mold in the plaintiffs' home and the fiberglass insulation removal and the plaintiffs' symptoms?

A Potentially they could say something in there.

Q You don't know because you didn't read those articles?

A Correct.

Q All right. Now turning to the last bold paragraph on page 32 of your report where you discuss these articles. Part of that paragraph that you looked at you say, Dr. Dickerson does not discuss any of the cleaning activities by the plaintiffs. What's the relevance of that?

A She claims that the contamination was present and was continuing to emit these odors,

than a couple of typos I definitely noticed and perhaps not making it clear when things are being directly quoted from the documents reviewed as opposed to appearing to be something that I was summarizing in my own words.

Q Is it possible that there's information in the literature Dr. Dickerson noted in her expert report that would link the plaintiffs' symptoms to mouse allergens?

A I suppose that might be the case but, again, I'm not a medical expert so I don't know what documents discussing medical cause and effect that I would be able to discuss or what would be in there.

Q I'm sharing my screen again on Campbell 880. Do you see this?

A It looks like the filter again.

Q It's the filter again. I want to zoom in. On these little clumps, do you see spots that would be consistent with mouse droppings?

A I don't see anything that definitively looks like that on what I'm seeing.