# Exhibit 8

Martin Upchurch Report

INVESTIGATION, RESEARCH AND TESTING

Since 1970

# Zamd, et al. v. Lambright Pest Control Services

Lambright Pest Control Services, Inc.

Zamd Residence
1338 L Street SE
Washington, D.C. 20003

Date of Incident: December 21, 2020

Prepared for:

**Ms. Katie Goodman**
**Markel Corporation**

P.O. Box 2009
Glen Allen, Virginia 23058

Claim No. CPCG20021V4181
File No. 1975.0012

## S-E-A Matter No. 03.141614

Issue Date: May 13, 2024

# Table of Contents

**List of Figures** .......... **3**

**Acronyms, Abbreviations and Definitions** .......... **4**

**I. Executive Summary** .......... **5**

Matter Assignment .......... 5

Scope .......... 5

Methodology .......... 5

Conclusions .......... 5

Signatures .......... 7

**II. Procedures** .......... **8**

**III. Discussion** .......... **11**

Background .......... 11

Document Review .......... 28

Arc Environmental Report .......... 28

Deborah E. Dickerson, PhD, CIH, CSP Expert Witness Report .......... 31

Columbia Restoration Letter .......... 33

DISCUSSION .......... 34

**Appendices** .......... **36**

Investigator Credentials .......... 36

## List of Figures

Figure 1: Attic space with original fiberglass batt insulation (date taken unknown). ..................12
Figure 2: Attic space with original fiberglass batt insulation (date taken unknown). ..................13
Figure 3: Attic space after the fiberglass batt insulation had been removed on December 21, 2020. ..........15
Figure 4: Attic space after the fiberglass batt insulation had been removed on December 21, 2020. ..........15
Figure 5: Attic space after the fiberglass batt insulation had been removed on December 21, 2020. ..........16
Figure 6: Attic space after the fiberglass batt insulation had been removed on December 21, 2020. ..........16
Figure 7: Photo of a bathtub area taken on December 21, 2020. ..........17
Figure 8: Photo of a toilet area taken on December 21, 2020. ..........18
Figure 9: Toilet tank lid photograph taken on December 22, 2020. ..........19
Figure 10: Third-floor hallway area photograph taken on December 28, 2020. ..........20
Figure 11: Photograph of the smoke detector taken on December 28, 2020. ..........21
Figure 12: Photograph of the duct cleaning equipment taken on January 4, 2021. ..........22
Figure 13: View of the duct cleaning hose attached to the HVAC unit on January 4, 2021. ..........23
Figure 14: View of an opened HVAC register taken on January 4, 2021. ..........24
Figure 15: View inside a duct taken on January 4, 2021. ..........25
Figure 16: View of an opened HVAC register in a stairwell taken on January 4, 2021. ..........26
Figure 17: View inside a duct taken on January 4, 2021. ..........27

## Acronyms, Abbreviations and Definitions

| | |
|---|---|
| g | Gram |
| HEPA | High Efficiency Particulate Air |
| HVAC | Heating, Ventilating and Air-Conditioning |
| mg | Milligram |
| mL | Milliliter |
| MVOC | Microbial Volatile Organic Compound |
| Ng | Nanogram |
| OSHA | The Occupational Safety and Health Administration |
| PEL | Permissible exposure limit |
| ug | Microgram |

# I. Executive Summary

## Matter Assignment

On April 3, 2024 SEA, Ltd. (S-E-A) was requested by Ms. Katie Goodman of the Markel Corporation (Markel) to conduct a review of available records in relation to the civil action of Zamd, et al. v. Lambright Pest Control Services, Inc., et al. The lawsuit is in relation to the removal and replacement of insulation from the attic area by Lambright Pest Control Serves, Inc. (Lambright) that reportedly caused contamination of the Zamd Residence (the Residence) located at 1338 L Street SE in Washington, DC with soiled fiberglass insulation. This review was assigned to S-E-A Senior Industrial Hygienist Martin E. Upchurch, CIH, CSP, as S-E-A Matter No. 03.141614.

## Scope

S-E-A was requested to review the available records concerning the claim that the Residence was contaminated with fiberglass insulation that had been soiled with mouse feces and urine, and that the contamination caused health concerns to the occupants of the Residence (Liza Zamd and John Campbell). Based on the review, S-E-A was also requested to prepare a written report with conclusions made based on the available information and S-E-A's expertise in Industrial Hygiene.

## Methodology

The methodology utilized by S-E-A during the investigation of this incident was in accordance with scientific methodologies and applicable principles. The investigation and analysis of any incident is a complex and scientific endeavor. The methodology of such an endeavor, therefore, must include the comprehensive, objective, and accurate compilation and analysis of the available data.

## Conclusions

- **Although the plaintiffs claimed to have observed widespread, recurring contamination in the Residence after the Lambright insulation removal and replacement project had been completed, no documentation of such widespread, recurring contamination was found in the provided documents. Photographs taken on December 21 and 22, 2020 show possible**

**light levels of dust on a toilet tank and bathtub (presumably in the same bathroom), and photographs taken on December 28, 2020 show a heavier level of dust on the top of the fire alarm below the attic access. None of the other approximately 250 photographs taken in the living spaces of the Residence by Ms. Zamd show visible dust or insulation debris.**

- **Plaintiff Liza Zamd reported that she visited the upper levels of the Residence and took photographs of the attic space before the original fiberglass batt insulation was removed and immediately after it was removed, but did not report having any adverse health effects or observing any odors during those visits. Ms. Zamd also reported that she visited the attic space after new TAP® insulation was installed by Lambright and did not report observing any odors in the attic. Lack of reported adverse health effects and/or odors during these visits contradicts that contamination from the removed insulation was the source of odors reported by the plaintiffs.**
- **No evidence of contamination in the Residence due to activities performed by Lambright were observed by Arc or indicated to be present by the Arc sample results.**
- **The "moderately elevated" level of mold reported by Arc was more likely than not due to mold growing on plants than building materials or claimed contamination from the attic insulation removal.**
- **Lacking such testing or analysis for insulation debris, MVOCs or murine antigens, and based upon the lack of odors being present in the attic area during Ms. Zamd's visits prior to new insulation being installed, there is no evidence that the insulation removal activities performed by Lambright were the cause of the odors or adverse health effects reported by the plaintiffs. In addition, no other potential source(s) of the odor or cause of any reported adverse health effects were identified by the plaintiffs or their expert.**

## Signatures

S-E-A and the undersigned hereby certify the opinions and conclusions expressed herein were formed to a reasonable degree of professional certainty. They are based upon the application of reliable principles and scientific methodologies to all of the facts known by S-E-A and the undersigned when this report was issued, as well as knowledge, skill, experience, training, and/or education. Should additional information be discovered, S-E-A and the undersigned reserve the right to appropriately amend or augment these findings.

Prepared By:

DocuSigned by:
Martin Upchurch
B7DBDAD270194C7...

Martin E. Upchurch, CIH, CSP
Senior Industrial Hygienist
Certified Industrial Hygienist
Certificate No. 8541 CP
Certified Safety Professional
Serial Number 30819

Technically Reviewed By:

Charles A. Guinther, Jr./ecf

Charles A. Guinther, Jr.

MEU:ljw

## II. Procedures

1. S-E-A reviewed the following documents provided by Markel:
   - Defendant Production
     - 1st Production
       - Customer lists
       - Training Materials
       - Licenses
       - Capital One Dispute
       - Employee List
       - Related Documents
     - 2nd Production
       - Auto List
       - Devine Costs
       - I-9
       - Insulation Agreement
       - Lambright Payments
       - Employee List (2017-present)
       - Attic Jobs 2017
       - Attic Jobs 2018
       - Attic Jobs 2019
       - Attic Jobs 2020
       - Payroll Records
       - Answer to Complaint
       - Complaint
       - Lambright's Answers to Plaintiffs' 1st Interrogatories
       - Lambright's Answers to Plaintiffs' 1st Request for Admissions
       - Lambright's Answers to Plaintiffs' 2nd Request for Production
       - Notice for Deposition - Tyrone Lambright
     - Insurance Policy
     - Lambright's Answers to Plaintiffs' 2nd Interrogatories

- Lambright's Answers to Plaintiffs' 1st Request for Production
- Lambright's Answers to Plaintiffs' 2nd Request for Admissions
- Lambright's Answers to Plaintiffs' 3rd Request for Admissions
- Lambright's Answers to Plaintiffs' 3rd Request for Production
- Lambright's Answers to Plaintiffs' 4th Request for Production

- Plaintiffs
  - Campbell Production
    - Campbell v. Lambright - Campbell0000047-320
    - Campbell v. Lambright - Campbell0000321-372
    - Campbell000373 Address Employment History
    - Photographs and videos Campbell000374-764
    - Plaintiffs' 1st Document Production
    - Plaintiffs' 2nd Document Production

      (Includes Arc Environmental Indoor Air Quality Assessment (Arc report))
  - Plaintiffs' Answers to Defendant's Interrogatories & RFP
  - Plaintiffs' Expert Report - Dr. Deborah Dickerson
- Depositions
  - Dwight Devine
  - John Campbell (Campbell depo)
  - Liza Zamd (Zamd depo)
  - Tyrone Lambright
- Pleadings
  - Defendant's Initial Disclosures
    - Charge Back Details
    - Insulation Removal and Installation Agreement
    - Markel Insurance Policy
    - Service Inspection Report, 12.18.2020
    - Service Inspection Report, 12.21.2020
  - Answer
  - Complaint, United States District Court for the District of Columbia, Case No. 1:23-cv-1132, filed April 24, 2023

- Defendant's Initial Disclosures, dated August 23, 2023
- Plaintiffs' Initial Disclosures, dated August 22, 2023

2. In addition to the above listed documents provided by Markel, S-E-A reviewed the following documents:
   - *TAP Pest Control Insulation Safety Data Sheet*, version date 11-2017.
   - *Environmental assessment and exposure reduction of rodents: a practice parameter*, Phipatanakul, et al, Annals of Allergy, Asthma & Immunology, December 12, 2012.
   - *Emissions of Fungal Volatile Organic Compounds in Residential Environments and Temporal Emission Patterns: Implications for Sampling Methods*, Kim et al, International Journal of Environmental Research and Public Health, 2022.

# III. Discussion

## Background

Per her deposition, Ms. Zamd bought the Residence in approximately 2013 and she was the first owner. The Residence is a condominium and has three levels above a basement level plus an attic. In late 2020, other residents of the condominium building reported issues with mice in their units, and in early December of 2020 she reported hearing what she assumed was mice in the attic. **Figure 1 and Figure 2** are photographs of the attic space reportedly taken by Ms. Zamd (dates taken unknown) showing the original fiberglass batt insulation.



**Figure 1: Attic space with original fiberglass batt insulation (date taken unknown).**



**Figure 2: Attic space with original fiberglass batt insulation (date taken unknown).**

Lambright was contacted by Ms. Zamd concerning the mice, and after an inspection on December 18, 2020 Lambright was contracted to perform work in the attic. Per the contract between Lambright and Ms. Zamd, the work was to include removing the old attic insulation, sanitizing, and then installing new TAP® Pest Control Insulation in the attic.

Lambright performed the work at the Residence on December 21, 2020. Although the Lambright insulation removal protocol was to have the insulation bagged before it was removed from the attic, the information available indicates that this was not done. During the removal of the old insulation, one worker reportedly worked in the attic gathering the fiberglass batts, who then handed the batts to a second worker who carried them to an exterior door on the third floor where they were dropped to the ground by the front door. The doors to the side rooms on the third floor were reportedly closed during the work, and the floor from below the attic access to the window/door were covered with plastic. The HVAC system was also reportedly turned off by Ms. Zamd while the work was being performed.

During the work on December 21, 2020 Ms. Zamd was reportedly working in the Residence on the first floor and John Campbell (her roommate and the second Plaintiff) was working on the second floor. After the old insulation had been removed, Ms. Zamd visited the third floor and attic space and took photographs of the attic. **Figure 3 through Figure 6** are photographs reportedly taken by Ms. Zamd at that time. When she visited the attic at this time, Ms. Zamd stated she did not have any breathing issues and did not observe any odors (Zamd depo page 45).



**Figure 3: Attic space after the fiberglass batt insulation had been removed on December 21, 2020.**



**Figure 4: Attic space after the fiberglass batt insulation had been removed on December 21, 2020.**



**Figure 5: Attic space after the fiberglass batt insulation had been removed on December 21, 2020.**



**Figure 6: Attic space after the fiberglass batt insulation had been removed on December 21, 2020.**

In the evening on December 21, 2020 after all work had been completed by Lambright, Ms. Zamd reportedly began to have trouble breathing, and both she and Mr. Campbell began to smell an odor in the Residence which was strongest on the third floor. They also reportedly observed what they described as "dust all over everything" on the third floor. **Figure 7 and Figure 8** are two of the four photographs reportedly taken by Ms. Zamd on December 21, 2020 in a living space area of the Residence. These four photographs were the only ones provided in the file that were taken from a living space area on this date, and they all appeared to have been taken in a bathroom area.



**Figure 7: Photo of a bathtub area taken on December 21, 2020.**




**Figure 8: Photo of a toilet area taken on December 21, 2020.**

The plaintiffs stated that Mr. Campbell cleaned the third floor on December 21, 2020, but the following day settled dust reportedly returned and then they both recleaned the third floor. Four additional photographs were taken by Ms. Zamd on December 22, 2020 in a living space area. These all appeared to be of the lid to a toilet tank, and again only a light amount of potential dust is visible in the photographs. **Figure 9** is one of the toilet lid photographs.



**Figure 9: Toilet tank lid photograph taken on December 22, 2020.**

Lambright was reportedly contacted about the dust, but an offer by Lambright to have a cleaning company come to the Residence was turned down by the plaintiffs. A representative of Lambright also returned to the Residence on December 28, 2020 and met with the plaintiffs but no additional work was performed by Lambright. Four photographs were taken by Ms. Zamd on this date, all in the third-floor hallway area. Two of these photographs are general views showing the proximity of a smoke detector on a wall and the pull-down attic access and return air grille in the ceiling. The other two photographs focus on the smoke detector and dirt or debris on it. **Figure 10 and Figure 11** illustrate the third-floor hallway and the smoke detector.



**Figure 10: Third-floor hallway area photograph taken on December 28, 2020.**



**Figure 11: Photograph of the smoke detector taken on December 28, 2020.**

The plaintiffs next retained Columbia Restoration (Columbia) to perform cleaning in the Residence. This was performed by Columbia on December 29, 2020 and the activities reportedly included wiping, dusting and HEPA vacuuming surfaces including furniture and rugs, and running HEPA-filtered air scrubbers in the residence through the morning of December 30, 2020. The plaintiffs had also acquired several WINIX air purifier machines and were reportedly running them in various areas of the Residence. Columbia also recommended that the plaintiffs clean all the textiles in the Residence and arranged to have Atlantic Duct Cleaning (Atlantic) come and clean the ducts on January 4, 2021. Ms. Zamd stated in her deposition that she had never had the ducts cleaned in the Residence since she purchased it in 2013. **Figure 12 through Figure 17** are photographs taken by Ms. Zamd during the duct cleaning activities.




**Figure 12: Photograph of the duct cleaning equipment taken on January 4, 2021.**




**Figure 13: View of the duct cleaning hose attached to the HVAC unit on January 4, 2021.**



**Figure 14: View of an opened HVAC register taken on January 4, 2021.**



**Figure 15: View inside a duct taken on January 4, 2021.**



**Figure 16: View of an opened HVAC register in a stairwell taken on January 4, 2021.**



**Figure 17: View inside a duct taken on January 4, 2021.**

Following the general cleaning and duct cleaning in the Residence, the plaintiffs reported that the air quality was better but an odor was still present on the third floor. The plaintiffs reportedly only used the third floor for storage of some items, and plastic sheeting was used to seal off the entryway to the third floor of the Residence. They also performed additional cleaning activities such as scrubbing the walls in the third-floor hallway and later painting walls in the master bedroom (also on the third floor) with Kilz but stated an odor could still be discerned on this level.

In addition to these activities, Ms. Zamd also filed a claim with her condo association's insurance company, State Farm. In response State Farm retained Arc Environmental, LLC (Arc) to perform an "Indoor Air Quality Assessment" in the Residence. Arc performed this assessment during multiple visits to the Residence. On January 24 and 31, 2022 and March 15, 2022 Arc performed visual inspections of the Residence for microbial growth and/or moisture damage. On January 24, Arc also collected air samples for boron and oil mist which are reportedly constituents of the TAP® insulation, and surface samples for mouse allergens. On January 31, Arc collected spore trap air samples for mold analysis. On March 15 Arc collected additional surface samples for mouse allergens. The results for these inspections and the testing results will be discussed in the following report section.

As the plaintiffs reported they could still discern an odor on the third floor, they decided to have the third floor renovated. This renovation included the removal and replacement of the drywall on the walls and ceilings and the removal and replacement of the TAP® insulation from the attic. This work was begun on February 21, 2022 and was reportedly completed in June of 2022. Following this renovation no additional odor was reported by the plaintiffs. It was noted that when the attic was reinsulated, rather than using the TAP® insulation, fiberglass batt insulation was used.

## Document Review

As noted previously, a number of documents were provided to S-E-A for review. Pertinent sections of a number of these documents will be discussed as follows.

### Arc Environmental Report

As noted previously, Arc was retained by State Farm in response to a claim filed by Ms. Zamd. The April 21, 2022 report prepared by Arc states "The request for industrial hygiene services was prompted following tenant concerns associated with allergic and respiratory symptoms associated with the upstairs, top level of the residence." Based on the information provided to Arc, sampling was performed for total airborne mold spore levels and for mouse urine proteins on surfaces potentially present due to the attic insulation removal activities, and for airborne levels of mineral oil and boric acid potentially present due to the attic insulation replacement activities.

The Arc report does not indicate that any visible contamination was observed on the three dates they performed testing at the Residence, and also did not note any unusual odors in the Residence. Arc did document the following observations from the inspections:

- Signs of a previous water leak was observed on the ceiling area of the top-level bedroom;
- No signs of active water intrusion were observed during the site visits; and
- No signs of suspect microbial growth were observed during the site visits.

The conclusions made by Arc based upon their observations and the sample results included the following:

- The sampling for the two main components of the insulation in the attic (Boric Acid and Mineral Oil) yielded sample results which were low, but at detectible levels. All samples were well below the applicable OSHA Permissible Exposure Levels (PELs) for each analyte tested;
- The mold sample results indicate there was a moderate level of mold present in the Bedroom (left of bathroom) area during the time of the survey on January 21, 2022;
- The results for both sampling events for the mouse allergens (mouse urine proteins) displayed low levels of mouse allergens which were all below the level of sensitization for mouse allergens;
- Between the time of the initial site visit on January 24, 2022 and the final site visit on March 15, 2022, the top level of the residence was renovated, and all drywall walls and ceilings were removed from this area. The area was in the process of being finished during the final site visit on March 15, 2022. This work served to remove the areas in the bedroom where the presence of mold was identified during the January 31, 2022 site visit;
- The residents noted to the inspector that following the removal of the drywall walls and ceilings in the top level of the residence, their allergic and respiratory symptoms were no longer present when they were present on the top level of the residence.

The Arc report also stated that the mouse allergen levels found in the Residence during their inspections ranged from 0.01 ng/mL to 0.14 ng/mL, and that the Sensitization Level for such allergens was 1.6 mg/g which they state was equivalent to 1.6 ng/mL. Arc did not identify the source of this reported sensitization level. In addition, the laboratory report for these samples

does not identify the method used for the analysis, what the limit of detection was for the testing, and there is no indication that a blank (unused swab) had been submitted to be analyzed for quality assurance purposes.

**The document** ***<u>Environmental assessment and exposure reduction of rodents: a practice parameter</u>*** **available on the National Institute of Health (NIH) website states that the sensitization level for mouse allergens is 1.6 ug/g, which converts to 1600 ng/mL. Based upon the sensitization levels in this report, the mouse allergen levels found by Arc were several orders of magnitude lower than this sensitization level. In addition, lacking the submission and analysis of an unused swab for quality control purposed, it cannot be demonstrated that the media used was not contaminated with mouse allergens prior to being used.**

**No evidence of contamination in the Residence due to activities performed by Lambright were observed by Arc or indicated to be present by the Arc sample results.**

In the body of the report where the mold samples are being discussed, Arc states that "Laboratory analysis of the collected air samples did indicate the presence of elevated indoor fungal counts; specifically, Smuts/Periconia/Myxomycetes spore counts found in the sample collected from the Bedroom 2 (left of bathroom) was found to be moderately elevated above the outdoor concentration (51)." In the actual laboratory report for these samples, the laboratory (AMA Analytical Services, Inc.) includes the following additional information on this group of molds:

"Smuts, Periconia, and Myxomycetes spores are grouped together due to their similar round, brown morphology. Smuts are outdoor parasitic plant pathogens. They rarely grow indoors but may grow on host plants if appropriate conditions are present. They are parasitic plant pathogens. They can be found on cereal crops, grasses, flowing plants, weed, and other fungi. They can cause allergies. Periconia are found in soils, dead herbaceous stems and leaf spots, and grasses. They have wind-dispersed dry spores. Their spores are abundant in the air but it is not known if they are allergenic. Myxomycetes are found on decaying logs, stumps and dead leaves. They have wind-dispersed dry spores and wet motile (amoebic phase) spores. During favorable conditions they move about like amoebae. They form dry airborne spores when

conditions are unfavorable. They are rarely found indoors. Health Effects: They may cause Type 1 allergies (hay fever, asthma). No human infections have been reported."

This information indicates that these types of molds grow on plants and soils, not building materials. In his deposition Mr. Campbell stated they he and Ms. Zamd had placed plants in the bedroom "…because we heard that plants could help scrub the air."

**Based upon the laboratory statement and Mr. Campbell's statement, the "moderately elevated" level of mold reported by Arc was more likely than not due to mold growing on plants than building materials or claimed contamination from the attic insulation removal.**

## Deborah E. Dickerson, PhD, CIH, CSP Expert Witness Report

In the Executive Summary of her March 3, 2024 report, Dr. Dickerson states that "The HVAC system was not de-energized."

Included in the documents Dr. Dickerson listed as having reviewed were the following:

- Deposition of John Campbell
- Deposition of Liza Zamd
- Combined photos (3a-3i)
- Indoor Air Quality Assessment Arc Environmental

**In the deposition of Ms. Zamd, she states that she did not have the HVAC system running while Lambright was performing work, which directly contradicts Dr. Dickerson's statement that the system was running.**

In her Executive Summary Dr. Dickerson also states that:

"Based upon my review of the materials described herein, and a reasonable degree of scientific certainty, I have reached the following conclusions:

**Opinion 1:** The Defendant engaged in improper procedures for removal and disposal of the contaminated attic insulation in the Plaintiffs' residence, which led to widespread contamination of the building interior and HVAC ductwork.

**Opinion 2:** The Plaintiffs' symptom pattern was likely caused by microbial volatile organic compounds (MVOCs) and/or murine antigens."

In her support of her first opinion Dr. Dickerson states that "…the method of removal of the material was a significant cause of distribution of the contamination throughout the residence."

**No evidence that contamination was distributed throughout the residence, such as photographs, testing or sampling was presented or identified by Dr. Dickerson.**

In support of her second opinion Dr. Dickerson states that "Upon review of the photographic evidence, the attic insulation was contaminated with organic material. Given the evidence of rodents, the odors detected, and the subsequent indoor air quality assessment which detected higher-than-background microbe presence in the home; I conclude that the insulation was likely contaminated with rodent urine and feces and fungal growth."

The previously discussed photographs provided to S-E-A for review indicate that the original attic insulation may have had settled dust on its surface, but no contamination identifiable as rodent urine or feces is visible in the photographs. In addition, fiberglass is not an organic material that would support mold growth, and mold growth was not identified on other materials in the attic space. Potential debris from prior roof repair activities was also reported to be present in the attic by the plaintiffs.

The Arc report cited by Dr. Dickerson was previously discussed by S-E-A, during which it was noted that the "higher-than-background microbe presence" referred to by Dr. Dickerson was more likely than not due to mold growth on plants.

**Although the Dickerson report lists numerous articles reportedly discussing the potential for MVOCs to be emitted by molds, Dr. Dickerson does not discuss any of the cleaning activities that had been performed by or for the plaintiffs that were reportedly unable to eliminate the odors reported by the plaintiffs. Dr. Dickerson did not discuss the fact that no visible contamination or odors were reported by Ms. Zamd immediately after the original insulation was removed by Lambright, at a time when materials claimed by Dr. Dickerson to have been contaminated with mold growth and mouse urine and feces would have been at their highest airborne levels.**

**In addition, Dr. Dickerson did not discuss the fact that no testing or sampling was conducted at any time for the plaintiffs which could have documented the presence of fiberglass insulation contamination, MVOCs, and elevated mouse antigen levels.**

In the Microbiological Volatile Organic Compounds section of her report Dr. Dickerson states that MVOCs "…can be produced by microorganisms in their primary or secondary metabolism."

**Dr. Dickerson does not explain that this states that MVOCs are produced when microorganisms are living and growing, or that the only microorganisms she claims to have been present in the Residence were molds. As no mold growth was observed or documented at the time of Lambright's work, and the removal of the old attic insulation did not cause an odor to be generated during or immediately after the removal, there is no basis for Dr. Dickerson's claim that microbiological organisms in the removed insulation were the source of odors reported by the Plaintiffs after the new insulation had been installed.**

**In the Conclusion of her report, Dr. Dickerson claims that "The wall board and furnishings were serving as reservoirs for the MVOCs and murine antigens and their removal restored the indoor environment of the premises."**

**Although inspections and testing could have been performed to verify the presence of MVOCs and murine antigens, no such inspections or testing were performed Dr. Dickerson.**

## Columbia Restoration Letter

Trevor Beckwith of Columbia Restoration (Columbia) prepared a letter for Ms. Zamd which was dated December 30, 2020. In this letter, Mr. Beckwith states that he did observe an odor in the Residence when he was there on December 29, 2020, and that the odor was the strongest on the third floor. He also stated that he felt and/or saw dust/particulates on horizontal surfaces which in his opinion "…did not appear to be just regular dust."

Mr. Beckwith stated that his crew "… spent most of December 29 working…" at the Residence, and that "they wiped/dusted/HEPA vacuumed all of the available surfaces, including your couch cushions." He also stated that they "…vacuumed the third-floor hallway runner and spare room rugs three times. However, the rugs continued to smell so he advised that you dispose of them."

In addition to the surface cleaning activities, Columbia used several HEPA air scrubbers in the Residence and left them running until approximately 10:00 am the following morning. Columbia also recommended and arranged for Atlantic Duct Cleaning to clean the ductwork in the Residence.

**Although Columbia reportedly performed work in the Residence, no photographs were taken that documented any reported dust/particulates claimed to have been observed, did not collect any samples to identify the composition and potential source of any such dust/particulates, and did not recommend that any other third-party expert be contacted to investigate the reported dust/particulates or odors in the Residence. Columbia also recommended that the rugs that were reported to have odors be disposed rather than being professionally cleaned.**

## DISCUSSION

Photographs taken by Ms. Zamd indicate that the old insulation removed by Lambright had been paper-faced pink fiberglass batt insulation that had been installed with the paper facing down on the ceiling drywall below. Daylight shining in some lower edge areas in the photographs indicate that soffit ventilation openings were present in at least some areas of the attic. These photographs also show that some debris remained in the attic at the time they were taken, but the nature of the debris (other than pieces of remaining batt insulation) cannot be discerned from the photographs. In addition, no indication of airborne dust or particulates are visible in the photographs.

Although the plaintiffs claimed that heavy concentrations of dust had been observed on surfaces throughout the third floor of the Residence, photographs taken by Ms. Zamd only show light levels of dust on surfaces in one area on the day the removal was performed (December 21, 2020) and the following day presumably in the same room, plus additional photos showing a heavier concentration of material on the smoke detector taken on December 28, 2020.

Neither onsite testing nor sampling with appropriate laboratory analysis was conducted that documented the presence of contamination from the removed attic insulation, not the purported presence of MVOCs or murine antigens as claimed by Dr. Dickerson. Lacking such testing or analysis and based upon the lack of odors being present in the attic area during Ms.

Zamd's visits prior to new insulation being installed, there is no evidence that the insulation removal activities performed by Lambright were the cause of the reported odors or adverse health effects reported by the plaintiffs. In addition, no other potential source of the odor or cause of any reported adverse health effects were identified by the plaintiffs or their expert.

Photographs taken during the duct cleaning activities performed by Atlantic showed accumulations of gray dust in the ducts. As was noted previously, the ducts had not been cleaned since Ms. Zamd purchased the Residence in 2013 and the visible dust in the ducts did not have the appearance of pink fiberglass insulation debris.

# Appendices

## Investigator Credentials

1. Investigator CV
2. Investigator Testimony Log
3. Investigator Billable Rate Disclosure

S·E·A

11869 Dorsett Road
Maryland Heights, Missouri 63043
314.567.3638 • 800.473.9050
Fax 314.887.0806
www.SEAlimited.com

# Martin E. Upchurch, CIH, CSP

*mupchurch@SEAlimited.com*

## Education

*The University of Kansas* — *Lawrence, Kansas*
Bachelor of Science
Architectural Engineering
May 1987

## Experience

**Senior Industrial Hygienist** — **2015 to Present**
*SEA, Ltd.* — *St. Louis, Missouri*
Consults and provides litigation support on matters regarding industrial hygiene/air quality, asbestos, and building condition.

Some areas of industrial hygiene/air quality consulting include the review of chemical usage; safety data sheet review; health and safety programs review; assessment of environmental factors/stressors, including air contaminants, chemical exposure monitoring for Occupational Safety and Health Administration (OSHA) compliance, and biological hazards, such as mold/fungi and bacteria; and assessment of potential physical hazards such as excessive levels of noise and temperature. Additional consulting related to claims of personal injury and deaths includes ambient air monitoring in occupational and residential settings for chemicals including carbon monoxide, carbon dioxide, respirable dust and volatile organic chemicals (VOCs).

Asbestos consulting includes, but is not limited to, historic asbestos usage and exposure documentation review, asbestos project documentation review, and building/facility inspections for asbestos-containing materials.

Building condition consulting includes, but is not limited to, mold/fungi and bacteria contamination due to water/vapor intrusion, damaged asbestos-containing material evaluations, smoke and soot contamination evaluations, and potentially hazardous chemical/substance contamination due to use or spills.

**Senior Industrial Hygienist** — **2004 to 2015**
*EFI Global, Inc.* — *Indianapolis, Indiana*
As a Senior Industrial Hygienist, managed and performed projects for a wide variety of clients. Tasks included meeting with clients to identify project goals, review safety concerns, delineating the scope of work to be performed, developing project budgets, and time constraints. Project

management included reviewing the scope of work to be performed, identifying staff requirements, and coordinated task assignments to ensure projects were completed to meet objectives on time and within budget, reviewing laboratory reports and data, preparing and reviewing reports with clients to ensure information and recommendations were conveyed clearly and that project goals had been met.

**Project Industrial Hygienist** **1990 to 2004**
*ATC/ATEC, Inc.* *Indianapolis, Indiana*
As a Project Industrial Hygienist, performed consulting services for numerous clients, including engineering companies, insurance companies, school districts, and the U.S. Postal Service. Projects included performing asbestos and lead inspections at facilities to assist consulting engineers in renovation design projects.

Performed chemical and noise exposure monitoring for industrial clients to assist with OSHA compliance at their facilities. Projects included identifying chemicals of concern, determining monitoring methodologies, conducting the monitoring, reviewing the results, and preparing reports with recommendations for tasks to lessen exposures.

Performed mold damage inspections at commercial facilities and residential structures for insurance companies to assist in defining the extent of damages, and identifying the source of the damage.

**Industrial Hygienist** **1989 to 1990**
*PSI, Inc./Hall-Kimbrell Environmental Services, Inc.* *Lawrence, Kansas*
As an Industrial Hygienist, performed asbestos inspections for school corporations, industrial facilities, and commercial facilities throughout the country. Also performed asbestos inspections at military facilities in the Panama Canal Zone. Assisted in the preparation of reports, management plans, and abatement project designs.

**Industrial Hygiene Technician** **1987 to 1989**
*Hall-Kimbrell Environmental Services, Inc.* *Lawrence, Kansas*
As an Industrial Hygiene Technician, performed asbestos inspections for school corporations, industrial facilities, and commercial facilities throughout the country. Assisted in the preparation of reports, management plans, and abatement project designs.

## Certifications

Certified Industrial Hygienist (CIH), Board for Global EHS Credentialing (BGC)
Awarded July 3, 2003, currently certified through June 30, 2028
Certified Safety Professional (CSP), Board of Certified Safety Professionals,
Awarded January 21, 2016, Certification No. CSP-30819
Mold Assessment Consultant (MAC), Texas Department of Licensing and Regulation
Licensed through 2024, License No. MAC1494
Mold Assessor, Florida Department of Business and Professional Registration, Licensed through 2024, License No. MRSA2748
Certified Fire and Smoke Damage Consultant (CFSC), American Council for Accredited Certification, Awarded January 10, 2018
OSHA Hazardous Waste Operations and Emergency Response Standard (HAZWOPER)
Initial 40-hour training in 1993, 8-hour refresher training 1994 through present

Certified Microbial Consultant (CMC), American Indoor Air Quality Council,
Certified 2002-2004
Environmental Protection Agency (EPA) Radon Measurement Proficiency Program
(RMP), 1994-1996
EPA Asbestos Hazard Emergency Response Act (AHERA) Asbestos Building Inspector
Initial 32-hour training in 1987, annual 4-hour refresher training 1988 through present
Accredited in Alabama 2016 through 2019
Licensed in Illinois 1987 through 2022
Licensed in Indiana 1990 through 2021
Licensed in Iowa 1993 through 2019
Licensed in Kentucky 1990 through 2019
Licensed in Michigan 2005 through 2009
Licensed in Missouri 2015 through 2022
Licensed in Ohio 1989 through 2019
EPA AHERA Asbestos Management Planner
Initial 24-hour training in 1994, annual 4-hour refresher training 1995 through present
Licensed in Indiana 1995 through 2021
Licensed in Illinois 1995 through 2016
Licensed in Kentucky 1995 through 2019
Licensed in Michigan 2005 through 2009
Licensed in Ohio 1995 through 2019
EPA AHERA Asbestos Project Designer
Initial 40-hour training in 1989, annual 8-hour refresher training 1990 through present
Licensed in Indiana 1990 through 2021
Licensed in Illinois 2004 through 2022

## Professional Affiliations

Diplomat, Board for Global EHS Credentialing (BGC)
Member, American Industrial Hygiene Association (AIHA)
Member, American Conference of Governmental Hygienists (ACGIH)

## Seminars and Additional Education

- 2022 – 14-Hour Mold Assessment and Remediation, AAA Construction School, Inc., Jacksonville, Florida
- 2021 – Mold Assessment Consultant Refresher, GEBCO Associates, LP, Hurst, Texas
- 2021 – American Industrial Hygiene Conference
- 2019 – Mold Assessment Consultant Refresher, GEBCO Associates, Hurst, Texas
- 2018 – American Industrial Hygiene Conference and Exposition, Philadelphia, Pennsylvania
- 2017 – Mold Assessment Consultant Environmental Training Program, GEBCO Associates, Hurst, Texas
- 2017 – Everything You Need to Know to Comply with the New Silica Rule, Galson Laboratories, Inc., webinar
- 2017 – Advanced Legionella, EMSL Analytical, Inc., webinar
- 2016 – American Industrial Hygiene Conference and Exposition, Baltimore, Maryland
- 2014 – American Industrial Hygiene Conference and Exposition, San Antonio, Texas
- 2014 – Bacteria: Evaluating Exposure and Health Risks, Center for Environmental Training Webinar

- 2013 – Strategies for Mold Investigations and Sampling, Center for Environmental Training webinar
- 2012 – American Industrial Hygiene Conference and Exposition, Indianapolis, Indiana
- 2012 – Bacteria including Legionella & MRSA, Allergens, and Risk Communication, Center for Environmental Training webinar
- 2011 – American Industrial Hygiene Conference and Exposition, Portland, Oregon
- 2011 – Advanced Fungal Workshop, EMSL Analytical, Inc., Indianapolis, Indiana
- 2009 – Professional Ethics: Doing What Is Right in the Practice of Industrial Hygiene, AIHA Indiana Chapter, Indianapolis, Indiana
- 2008 – American Industrial Hygiene Conference and Exposition, Minneapolis, Minnesota
- 2008 – Environmental Chemistry An Introduction, Environmental Management Institute, Indianapolis, Indiana
- 2007 – American Industrial Hygiene Conference and Exposition, Philadelphia, Pennsylvania
- 2007 – Indiana Department of Environmental Management Illegal Drug Lab Cleanup Qualified Inspector Training, Indianapolis, Indiana
- 2006 – American Industrial Hygiene Conference and Exposition, Chicago, Illinois
- 2004 – Certified Microbial Consultant Review Course, American IAQ Council, Indianapolis, Indiana
- 2004 – Basic Orientation Plus (Industrial Site Safety Training), Tri-State Industrial Safety Council, Evansville, Indiana
- 2003 – Lead Paint Inspection System Factory Training, RMD, Indianapolis, Indiana
- 2002 – Mold in Indiana - Current Legislative, Legal and Scientific Issues, American Indoor Air Quality Council, Indianapolis, Indiana
- 2001 – OSHA Guide to Industrial Hygiene Course, OSHA Training Institute, Ypsilanti, Michigan
- 1999 – Lead Inspector Technician Training Recertification Course, The University of Illinois at Chicago
- 1996 – Lead Inspector Technician Training Recertification Course, The University of Illinois at Chicago
- 1994 – Lead Inspection Training Course, The University of Illinois at Chicago
- 1994 – Radon Measurement Operator Proficiency Course, The University of Illinois at Chicago
- 1993 – Lead Contractor Supervisor Course, The University of Illinois at Chicago

## Courses Taught/Presentations

- 2023 – "Liability Due to Ventilation Practices," DRI Product Liability Conference, Austin, Texas
- 2023 – "Asbestos, What We Know Now," Wisconsin Fire Loss Association, Fond du lac, Wisconsin
- 2019 – "Mold 2019," St. Louis Claims Association, St. Louis, Missouri
- 2018 – "Asbestos, What We Know Now," Travelers Insurance, St. Louis, Missouri
- 2018 – "Asbestos, What We Know Now," HeplerBroom LLC, Edwardsville, Illinois
- 2015 – "Water Damage Claims, Preventing Future Mold Claims," Southern Financial Insurance Group, Tallahassee, Florida
- 2005 – "Water Damage Claims, Preventing Future Mold Claims," National Association of Mutual Insurance Adjusters, Indianapolis, Indiana

**Testimony Log***

Martin E. Upchurch

1/13/2020 - 5/13/2024

*Maintained in accordance with Federal Rule 26

| Case Caption | Type | Date | Venue | Court No. |
|---|---|---|---|---|
| Eric and Aimee Wolf vs. State Farm Fire and Casualty Company | Deposition | 4/15/2024 | United States District Court Western District of Louisiana Lake Charles Division | 2:22-CV-02225 |
| CIALO, P.C., Plaintiff vs. Saumil Oza and Tempo Ventures LLC, Defendants | Trial | 3/8/2024 | Circuit Court of Cook County, Illinois | 2020 L 5061 |
| Richard A. Rankin v. A. Zahner Co., Inc. | Deposition | 8/10/2023 | Division of Workers' Compensation, State of Missouri | 18-108304 |
| Laura Schneider vs. Terra Energy Partners LLC | Trial | 7/25/2023 | 281st District Court of Harris County, Texas | 2019-81861 |
| Jefferson Heights Apartments, LLC, Plaintiff vs. Lexington Insurance Company, Defendant | Deposition | 2/20/2023 | US District Court in the Western District of Missouri Central Div. | 2:22CV4037 |
| Joshua & Elizabeth Tipton vs. USAA, ServiceMaster Restore and Phoenix Restoration, Inc. | Deposition | 2/9/2023 | Tenth Judicial District Court of Johnson County, Kansas | 21CV04881 |
| Jon Orelt, Plaintiff v. Ameren Illinois Company and Sauget Sanitary Development & Research Assoc. d/b/a American Bottoms, Defendants | Deposition | 11/10/2022 | Twentieth Judicial Circuit St. Clair County, Illinois | 20-L-0934 |
| Tammy B. Gion, Plaintiff vs. Southfield Partnership, LP | Trial | 5/20/2022 | Missouri Circuit Court for the Twenty-First Judicial Circuit, County of St. Louis | 16SL-CC00723 |
| Cialo, P.C. v.<br>Saumil Oza and Tempo Ventures LLC<br>v.<br>Market Square Lofts Condominium Association | Deposition | 4/14/2022 | Circuit Court of Cook County, Illinois County Department, Law Division | 2020 L 5061 |
| Eric R. Hinrichs, et al. vs. Nick Whiteman, et al | Deposition | 1/20/2022 | Circuit Court of Platte County, Missouri | 19AE-CC00299 |
| Gateway Housing, L.P. v. Morrissey Construction Company, and Trivers Associates, Inc. | Deposition | 2/10/2021 | Circuit Court for Madison County, Illinois | 17-L-427 |

11869 Dorsett Road
Maryland Heights, Missouri 63043
314.567.3638 • 800.473.9050
Fax 314.887.0806
www.SEAlimited.com

# FEE/COST SUMMARY

*Martin E. Upchurch, CIH, CSP*

Investigative and engineering analyses are conducted on a time-and-expense basis. SEA, Ltd. invoices for activities, including but not limited to, travel time, scene inspection, follow-up investigation, testing and analysis, documentation and report writing, court preparation, deposition and courtroom testimony. The hourly fee per individual is the same, regardless of the activity being performed on the project (travel, scene inspection, communication, deposition, trial, etc.). **The current billable rate per hour for** *Martin E. Upchurch is $335.*

SEA, Ltd. also invoices for any out-of-pocket expenses on an actual cost basis. Other expenses may include, but are not limited to, travel costs, photographs, photocopies, police/fire/agency reports, postage, faxes, international long-distance telephone charges, supplies, equipment or tool rental when required, evidence storage fees, and special testing or laboratory services. Often, chemical laboratory charges are established on a fee-per-sample/per-test basis (i.e., fire debris by gas chromatography). Items not included in the fee-per-sample rate will either be quoted a rate and/or analysis performed at the chemist's regular hourly rate.

*This document is submitted in response to your request. This document is Privileged and Confidential. This document is not to be disseminated to any third party in any other manner or form than indicated. Rates listed are effective 1/1/24. Hourly rates may be subject to change. To ensure accuracy, please inquire about current rates.*