# Exhibit 12

Liza Zamd Declaration

Declaration of Liza Zamd

1. My name is Liza Zamd and I was born on October 19, 1979.
2. I have continuously lived at 1338 L St. SE, Washington, DC ("home") since I bought the home (with my parents as part owners) in September of 2013. My home is part of a seven unit homeowners association (HOA) called Eastbridge Court. My former domestic partner, John Campbell, lived with me in the home from July 2020 until July 2023.
3. I discussed much of the initial facts of this matter in a sworn declaration I signed on January 25, 2021 and produced to my credit card company when contesting Lambright Pest Control's (LPC) credit card charges. That sworn declaration was produced in this litigation as Campbell000001-4. I am not sure why, but it appears that my electronic signature on the last page was stripped from the declaration in the discovery production process. However, the electronic signature was on the original document, which LPC itself may have because my understanding is that the credit card company provided LPC with the documentation.
4. Before I bought my home, the sellers disclosed that they placed a new roof over most of the unfinished attic, but the sellers did not replace the fiberglass insulation that got wet during the leak and got wood debris from the new roof, so it has always been dirty. Further, the roofers did not replace one particular wood panel next to the house's wall with black spots from prior moisture. About once or twice a year, I take pictures of the spot and compare it to prior photos to make sure it is not growing in size, which would be an indication of a leak.
5. On December 3, 2020, a few weeks before Lambright Pest Control (LPC) did work in my home, I took a photo of the panel in the attic with the black spots (which has been produced in this litigation as Campbell0000765). In the photo, you can see how gross the fiberglass insulation is with the dirt, wood shavings from the roof repair, dust and debris. You cannot tell from the photo, but there are joists separating the fiberglass insulation batts, and I walk on those joists when moving around my attic.
6. My home's attic roof is structurally the same as when I bought my home in 2013, but there have been minor repairs to the roof tiles at various points because of water leaks.
7. I have been in my home's attic many dozens of times. Climbing the step ladder from the third floor to the attic takes very little time--about five seconds.
8. The home's attic is roughly the same footprint--length and width--as the rest of the home. The large, central part of the attic--which includes the area to access the step ladder--is about 80 inches tall (over 6.5 feet).
9. The 80-inch roof height roof extends the width of the attic (about 12 feet) and for about 13 feet length-wise (which is oriented east-west). On both the east and west end of the attic, the roof gradually slopes down such that by where the roof meets the soffits, I need to crouch down on my knees to avoid hitting my head.
10. Since I was a child, I have had a poor sense of smell. People around me regularly smell pleasant fragrances, like cookies, or unpleasant odors, like garbage, but I often cannot smell them. In my December 2023 deposition in this case, I said that "I don't have the

best sense of smell" in the colloquial way, which meant that my sense of smell is quite poor.

11. On December 21, 2020, from approximately 1:38pm - 1:41pm ET, I took photos of the attic floor on my cell phone after LPC had removed the fiberglass insulation. Plaintiffs produced those photos in this litigation as Campbell0000380-397 (and some included in Ex. 9, Photographs, p. 1-6, in Plaintiffs' Motion for Summary Judgment). When I went up to the third floor and attic I was wearing a mast, and the Juliet doors were open.

12. On December 21, 2020, at approximately 1:44pm ET, I took a photo of the attic insulation that I saw piled outside my home, identified in this litigation as Campbell00000398 (and Ex. 9, Photographs, p. 7, in Plaintiffs' Motion for Summary Judgment). In the photo, the frosted glass on the right side of the front door is pinkish because there was a large mound of fiberglass insulation spanning all the way across the front walkway (piled about 6ft. high), and it was blocking my neighbors' access to their homes.

13. When I saw the insulation blocking my neighbors' access to their homes, I asked the LPC employee (who was at the juliet doors, looking down), to please move the insulation so that my neighbors could have a way to get in and out of their homes. That was the first time that I saw that the insulation was unbagged, but even then I did not know if LPC removed the insulation from my home in bags and just opened the bags in front of the home. After talking to the LPC employee, I stepped back inside my home but then decided to take a photo of the insulation before closing the door.

14. After LPC finished their services on December 21, 2020, John and I saw, smelled, and felt (based on the physical discomfort when breathing) that there was something wrong with third floor of our home because surfaces that were clean before LPC came that morning, now had dust and debris; our third floor which normally did not smell of anything, instead smelled terrible; and although we previously were able to breath and not experience lung pain or headaches, that was occurring from being on the third floor for just a minute.

15. Had Mr. Lambright told me that LPC might not bag the insulation, and that the insulation contaminants could circulate throughout my home, I would have never contracted with LPC.

16. What John and I did not immediately understand the evening of December 21, 2020, was the breadth of the issue caused by LPC not bagging the attic insulation; John and I became alarmed when we cleaned the third floor and the dust came back the next day (as if we hadn't cleaned), and then became incredibly worried once our breathing problems spread to other floors after our HVAC had been running. I had never experienced anything like this, and had no way to know that our home would become unlivable because of the attic insulation contaminants that spread throughout it.

17. While checking in on the third floor on December 28, 2020, I noticed the dust and debris over the smoke detector in the hallway, which John and I had overlooked when cleaning. I took photos produced in the litigation as Campbell0000450-451 (and Ex. 9, Photographs, p. 8-9, in Plaintiffs' Motion for Summary Judgment).

18. When the duct-cleaning company came to the home on January 4, 2021, they called me downstairs to show me my HVAC filter. It was very dirty and had chunks of insulation on it. It also seemed to have pieces of black pellets that were taped in the middle, which looked like mouse droppings that I had seen when I've had mice in other homes. I took a picture of the HVAC filter with the insulation pieces and black pellets and it has been produced in this litigation as Campbell00000880 (and Ex. 9, Photographs, p. 12, in Plaintiffs' Motion for Summary Judgment).

19. In the period where John and I were sleeping in the basement and not spending time on the third floor, there were infrequent situations when he or I went into the attic, such as to check on the roof panel with black spots to make sure that there was not moisture coming into the air. We would wear a mask but still have breathing problems and headaches (usually starting with our sinuses) on the third floor, pulling the attic step-ladder down. However, as soon as I (or John) were in the attic, we stopped having lung pain or headaches. At the time, the attic had the TAP blown insulation made of paper, that LPC installed. Our breathing problems (and sometimes headaches) resumed when we got down onto the third floor and folded the ladder to tuck it into the attic access panel. For this reason, it seemed clear to us that the TAP insulation was not the cause of our lung pain while being on the third floor.

20. John and I were particularly anxious about the unfolding disaster in the home because of both the health and financial implications. The health issues were concerning not only because of Covid, but because I already had sensitive lungs that hurt when I breath in irritants that don't generally bother other people. For example, I have had many situations where I've been in rooms that were cleaned with bleach or ammonia products and while other people don't enjoy the smell, they report that they have no pain breathing. In contrast, I experience lung pain that is usually so severe that I must leave the room. The same thing has happened with mold--most people don't even perceive there is anything in the air, whereas it hurts my lungs to inhale. Ironically, I often do not know what the irritant is that is causing my lungs to hurt because my sense of smell is poor.

21. The financial issues were particularly concerning to me because my parents own the home with me, and it is the only home the three of us own (they rent their home) so the prospect of the home needing substantial repair or being unsellable caused me a lot of anxiety.

22. Even after the contractors we hired, N&R Construction, removed the drywall, John and I kept the exterior juliet doors and bedroom window on the third floor open when the construction crew was not present. This was because we were unsure whether the contaminants could have possibly been on the floors (which we did not replace) and although rugs, which we had to throw away, covered much of the floor, they didn't cover every square inch.

23. I have very open and friendly relationships with five of the six other members of my Homeowners Association (HOA). The only exception is my immediate next-door neighbor, Karen Harris. Since I bought my home, my relationship with Karen has been

strictly professional and we do not socialize or generally speak about issues unrelated to the HOA.

24. In December of 2020, Karen Harris referred a contractor, Lambright Pest Control (LPC), to the full HOA because she saw mice in her home. I have found Ms. Harris to generally have high standards for the contractors we've used in our HOA.

25. When I contracted with LPC, I did not know if Karen Harris had also done so. I did not learn that Ms. Harris was dissatisfied with LPC's work until December 29, 2020, when I complained to the HOA about LPC's work and she responded similarly. I did not learn that Ms. Harris contested the credit card charge for LPC's services until Mr. Lambright stated it in his 30(b)(6) deposition in November of 2023.

26. I have never had wallpaper or malt extract agar in the home. Before approximately April 2022, I also did not have any silicone gel. However, even after using silicone gel in the home in April 2022, I've not had any breathing or health issues.

27. I have always had several plants in my home. I've largely had the same plants from about 2016 to present. I did not give away or get new plants between September 2019 and March 2021, and I have almost the exact same plants now (I gave one or two away, and got one or two new plants). My plants have never caused me any breathing difficulties and it was perplexing for me to read Defendant's purported expert, Martin Upchurch, hypothesize, that my plants would have suddenly caused me and John breathing problems that started only after LPC finished its work, and then immediately stop causing us issues once the third floor drywall was removed.

28. John and I tried to avoid this litigation altogether by attempting to settle pre-Complaint (twice) and then again after my and John's depositions. However, that was not possible because Defendants never gave us a settlement offer.

29. To date, our attorney has spent over 300 hours on this matter which, at the Laffe matrix rate of $948/hour, would be over $280,000 in attorney's fees, which does not include Plaintiffs' litigation costs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

12-5-24

________________________ ______________

Liza Zamd Date